**PANTRY PRIDE, INC., Plaintiff,**

v.

**Patrick J. ROONEY, Rooney, Pace Group Inc., Rooney, Pace, Inc., Stuart Perlman, the Estate of Philip Devon, Dwight Devon, Dana Devon, Alvin Brensilver and Howard Gittis, Defendants.**

**Patrick J. ROONEY, Defendant and Counterclaimant,**

v.

**PANTRY PRIDE, INC., Counterclaim Defendant,**

and

**Grant C. Gentry and Roger L. Galassini, Additional Counterclaim Defendants.**

84 Civ. 8026 (JMC).

United States District Court, S.D. New York.

Dec. 5, 1984.

Shereff, Friedman, Hoffman & Goodman, New York City (Barry L. Katz and Richard A. Weinberg, New York City, of counsel), for plaintiff.

Skadden, Arps, Slate, Meagher & Flom, New York City (Thomas J. Schwarz, Jonathan J. Lerner, Peter L. Zurkow, New York City, of counsel), for defendants Patrick Rooney, Rooney, Pace Group Inc., Rooney, Pace Inc.

Ashinoff, Ross & Goldman, New York City (Reid L. Ashinoff, Michael H. Barr, David Klasfeld, New York City, of counsel), for defendant Stuart Perlman.

## OPINION

CANNELLA, District Judge:

Plaintiff's motion for a preliminary injunction is denied. Fed.R.Civ.P. 65(a).

Defendant Stuart Perlman's motions for summary judgment and sanctions are denied. Fed.R.Civ.P. 56(b); 11.

## FACTS

Plaintiff Pantry Pride, Inc. ["Pantry Pride"] and defendants are engaged in a heated and well-publicized proxy contest for control of Pantry Pride. Plaintiff seeks to enjoin certification of the results of Pantry Pride's December 6th Annual Meeting of Shareholders if defendants' slate of nominees are elected to the board of directors.

Pantry Pride, a Delaware corporation with executive offices in Florida, is the successor to Food Fair, Inc., which emerged from bankruptcy on July 6, 1981. Pantry Pride operates food supermarkets and since May 25, 1984 when it acquired Devon Stores, Inc. ["Devon Stores"], it has also managed a national "hard goods" retail chain. On November 1, 1984, Pantry Pride purchased a controlling interest in Adams Drug Stores, Inc., a New England drug and health store chain. There are currently 37,781,761 outstanding shares of Pantry Pride common stock registered on the New York and Pacific Stock Exchanges.

The individual defendants are Pantry Pride shareholders, who organized the Pantry Pride Stockholders Committee ["Committee"] to conduct this proxy contest. Patrick J. Rooney, a New York resident, is Chairman of defendant Rooney, Pace Group Inc. ["RPG"]. RPG is a Delaware corporation with executive offices in New York. It is engaged in securities brokerage and other financial activities primarily through its principal subsidiary, defendant Rooney, Pace Inc. ["Rooney Pace"]. Stuart Perlman is a private investor residing in Florida. Dwight Devon is a New York employee of Devon Stores, Philip Devon's son and a coexecutor of defendant Estate of Philip Devon. Dana Devon, a New York attorney, is coexecutor of her father's estate. Alvin Brensilver is a former Devon Store officer residing in New York. Howard Gittis, the Committee Chairman, is an attorney residing in Pennsylvania. Counterclaim defendant Grant C. Gentry is Pantry Pride's Chief Executive Officer and resides in Illinois. Counterclaim defendant Roger L. Galassini is Pantry Pride's Chief Operating Officer and resides in Florida.

The amended complaint alleges that defendants violated sections 13(d),[1] 14(a)[2] and

1. Amended Complaint, ¶¶ 68–83, 84 Civ. 8026 (JMC) (filed Nov. 23, 1984).

2. Id., ¶¶ 63–67, 84–92.

16(b)[3] of the Securities Exchange Act of 1934 ["the Act"], 15 U.S.C. §§ 78m(d), 78n(a), 78p(b). The complaint also charges breaches of fiduciary duties[4] and contract[5] against Philip Devon, Dwight Devon and the Devon Group and an assertion of fraud against the Devon Group.[6] On December 3, 1984, the Court conducted an evidentiary hearing on plaintiff's motion pursuant to Fed.R.Civ.P. 65.

The following are the Court's findings of fact and conclusions of law: On July 7, 1981, Pantry Pride emerged from bankruptcy with a valuable $350,000,000 net operating loss [NOL] carryforward and high hopes for future diversification and acquisition.[7] In 1983 and early 1984, Rooney and other financial analysts were impressed by Pantry Pride's market potential, based in large part on the NOL carryforward.[8] Pantry Pride delivers bargains on the supermarket shelves, and Rooney, deciding that its stock represented an even better value, recommended it to his clients.[9] Rooney's optimism was short-lived.

On May 25, 1984 Pantry Pride acquired Devon Stores, a company traded on Nasdaq and principally owned by Philip Devon,[10] despite the opposition of many shareholders including Rooney.[11] Philip Devon, his family and Brensilver ["Devon Group"] became Pantry Pride's largest group of stockholders with 3,932,831 shares [10.4%] of common stock.[12] A voting trust agreement gave Philip Devon the power to vote all these shares until the earlier of April 5, 1993 or his death.[13] Philip Devon became a director of Pantry Pride after acquisition.[14] He died on November 5, 1984, hours after publicly announcing his decision to challenge the incumbent board of directors.

In August or September 1984, Rooney contacted Philip Devon in an effort to broker some of Devon's stock.[15] After a September meeting in Devon's New York apartment,[16] Rooney made efforts to find a potential buyer for Devon's stock.[17] It was during this meeting and subsequent conversations that Rooney discovered that Devon, like Rooney, was unhappy with Pantry Pride's recent operations.[18] Rooney contacted several prospective buyers to buy Devon's stock, including many well-known "corporate raiders" such as Sir James Goldsmith, Charles Hurwitz, Irwin Jacobs and David Murdock.[19] In his role as stockbroker, Rooney also spoke with representatives from many of Pantry Pride's largest institutional shareholders during September and October.[20] Some of these conver-

---

**3.** *Id.,* ¶¶ 106–07. Plaintiff asserts that it is entitled to shortswing profits from Philip Devon's sale of stock to Howard Gittis.

**4.** *Id.,* ¶¶ 93–105. Plaintiff claims that Philip Devon divulged confidential information and misled Pantry Pride management.

**5.** *Id.,* ¶¶ 108–21. Dwight Devon and the Devon Group are alleged to have continued Philip Devon's plan to sell Pantry Pride stock in violation of Pantry Pride's 3-year "first refusal" right.

**6.** *Id.,* ¶¶ 108–16. Plaintiff maintains that it was cheated by the Devon Merger, specifically from the Devon Group's overestimated accounts receivable, inflated inventory and misleading accounting practices.

**7.** *See* Defendants' Exhibit ["DX"] 26 at 2–4; Deposition of Otto H. Maurer, 51–52 & Exh. 1 at 69–70.

**8.** *See* Deposition of Patrick J. Rooney at 38–39; Deposition of Mary Jane Gilday at 33–36.

**9.** *See* Rooney Deposition at 37.

**10.** *See* DX 27 at 3.

**11.** *See* Deposition of Judith M. Napier at 60–72; Deposition of Leonard Toboroff at 18–21.

**12.** *See* Plaintiff's Exhibit ["PX"] 15.

**13.** *See* DX 2 at 2.

**14.** *See id.* at 3.

**15.** *See* Rooney Deposition at 91–92.

**16.** *See id.* at 97.

**17.** *See id.* at 102–03.

**18.** *See id.* at 54, 100.

**19.** *See id.* at 103.

**20.** *See* Rooney Deposition at 141–42; Deposition of Richard E. Kroon at 10–11; Deposition of Mark S. Yamada at 27–28.

sations in October concerned the poor performance of Pantry Pride management and the possibilities of a proxy fight.[21]

On October 5, 1984, Arthur Goldberg, a New Jersey investor, purchased through Rooney one million shares of Pantry Pride common stock.[22] Six hundred and sixty thousand of these shares were transferred from Manufacturers Life Insurance Company of Canada, a long-standing Rooney client.[23] Goldberg had dealt previously with Pantry Pride management and now made an unsuccessful overture for a seat on the board of directors.[24] Mid-October meetings between Goldberg, Rooney, Devon and Edward Landau, Devon's attorney, did not result in either a proposed Devon-Goldberg stock sale or the formation of a proxy group,[25] and on October 18, 1984, Goldberg sold his million shares with proxy to MacAndrews & Forbes Group Inc. ["MacAndrews"], a New York manufacturing and holding concern.[26]

Bruce Slovin, MacAndrews's president, also met several times with Landau in an unsuccessful attempt to strike a deal for Devon's stock.[27] Slovin then met with Gentry and Galassini on October 23, and requested two seats on the twelve member Pantry Pride board of directors.[28] When this request was rejected, Slovin decided not to participate in an unfriendly takeover and, without notifying Devon or Rooney, he requested Drexel Burnham Lambert, Inc. ["Drexel"] to sell MacAndrews's mil-

lion shares.[29] Drexel was able to sell only 50,000 shares.[30]

On October 29, 1984, Rooney, Devon, Landau, and Slovin met with Lou Nicastro, the Chairman of Williams Electronics, Inc. ["Williams"], a public company manufacturing electronic games.[31] Among other matters discussed were the possibility of Williams's purchase of stock from Devon and MacAndrews and the possibility of a proxy contest.[32] Before any decision was made by that group, however, Stuart and Clifford Perlman entered the scene and the proxy fight was officially underway.

On October 31, 1984, the Perlmans purchased 1,668,200 shares [4.4%] in Pantry Pride, including MacAndrew's remaining 950,000 shares.[33] The additional 718,200 shares were purchased in trades arranged by Rooney. They included a 230,000 block originally purchased on October 19, 1984 by Strong-Corneliuson Capital Management, another Rooney client.[34]

Although Devon may have considered the possibility of a proxy fight previously, it was not until the Perlmans emerged that he came to a final decision.[35] On October 31, 1984 Devon entered into an agreement with the Perlmans giving them a proxy for all his shares and promising to pay all expenses in connection with the proxy contest.[36]

The next day, Stuart Perlman and Rooney met with Pantry Pride management, but the Perlmans were unable to gain board participation.[37] That afternoon, De-

---

21. *See* Kroon Deposition at 12–14; Yamada Deposition at 29.

22. *See* Deposition of Edward Landau at 135.

23. *See* Rooney Deposition at 194–95.

24. *See* Deposition of Roger L. Galassini at 66.

25. *See* Rooney Deposition at 170–71; Landau Deposition at 120–23.

26. *See* Deposition of Bruce Slovin at 25–28. October 19, 1984 is the record date for the December 6, 1984 shareholders meeting.

27. *See* Slovin Deposition at 80.

28. *See* Deposition of Grant C. Gentry at 156.

29. *See* Deposition of Joseph L. Castle, II at 102.

30. *See* Slovin Deposition at 90–94.

31. *See id.* at 96.

32. *See* Rooney Deposition at 37–43.

33. *See* Deposition of Stuart Z. Perlman at 44–45.

34. *See* Deposition of William D. Corneliuson at 12–14.

35. *See* Landau Deposition at 128–29.

36. *See* PX 2 at 14–15.

37. *See* Gentry Deposition at 186–87.

von resigned from the Pantry Pride board.[38] The Perlmans also entered into a consulting agreement with Rooney Pace on November 1. The agreement provided that Rooney Pace would receive a one million dollar fee if the Perlmans were successful in electing a dissident slate and commissions from any sale of the Perlmans' stock before May 1985.[39]

Sometime between November 2 and November 5, 1984, Devon decided that the Perlmans were not the best prospects to lead a proxy contest because of their unsavory business reputations, and terminated his official arrangement with them.[40] On November 5, 1984, Gittis replaced the Perlmans as the proxy leader and agreed with Devon to purchase 100,000 shares of stock as well as options for other shares.[41] That evening, Philip Devon died. Before the next day passed, the Devon Group agreed to throw its now considerable support squarely behind the dissidents.

Pantry Pride's November 5 proxy statement giving notice of the December 6 meeting [42] was amended on November 6 to note Devon's death and the Devon Group's filings.[43] The Devon Group's Schedule 13D Amendment filed November 5, states that the Perlmans "reserve the right" to vote for either slate of nominees and Rooney Pace intends to "recommend" to its clients that they vote for the dissidents.[44] A second amendment filed by the Devon Group on November 7, notes that Dana Devon and Alvin Brensilver "currently intend to vote their shares in favor of the [Committee] slate." [45] The Devon Group's Schedule 13D was amended again on November 15,[46] November 26 [47] and November 27.[48] The Perlmans filed a Schedule 13D on November 7,[49] that was amended twice.[50]

The Committee sent a letter to all shareholders on November 14 informing them of the proxy battle and the need for "major changes".[51] Pantry Pride responded with a

38. *See* DX 13 at 23.

39. *See* PX 3.

40. *See* Landau Deposition at 64–66.

41. *See* Deposition of Howard Gittis at 38–41.

42. *See* DX 1. Defendants assert that the proxy statement and supplement are materially false and misleading because they fail to divulge Pantry Pride's secret compensation plan; Gentry's part-time status; that Gentry was not induced to stay at Pantry Pride for additional compensation; and that Pantry Pride's acquisition program was unsuccessful.

43. *See* DX 2.

44. PX 2 at 9–11. Plaintiff asserts that this amended Schédule 13D is materially false and misleading because it does not reveal when the Committee was formed; the Committee's actual stock breakdown; that Rooney actually had a "plan" to vote for the proposed slate; sufficient prior agreements, present arrangements and future plans of the Committee; the prior proxy solicitations; the Devon-Gittis shortswing profit problem; the threat posed to the NOL carryforward and Devon's breach of fiduciary duties.

45. PX 3 at 23. Plaintiff asserts that the second amendment is materially false and misleading because it fails to divulge Rooney's actual share ownership; that the Perlmans, Gittis and Leonard Toboroff were part of the Committee; the arrangements between Gittis and the Commit-

tee; transactions between October 31, 1984 and November 5, 1984; whether certain investigations into the Rooney financial network were valid; that there was not a "challenge" to a February 1984 Securities & Exchange Commission probe that had been admitted; transactions involving State Street; the May 1984 American Stock Exchange investigation; the Rooney-Perlman agreement; and that Dana Devon and Alvin Brensilver actually supported the Committee.

46. *See* PX 4.

47. *See* DX 16.

48. *See* DX 17.

49. *See* DX 19. Plaintiff asserts that the Perlmans' Schedule 13D is materially false and misleading because it does not adequately disclose the Perlmans' links to the Committee and organized crime.

50. *See* DX 20, 21. Plaintiff asserts that the Perlmans' Schedule 13D Amendment # 2 is materially false and misleading because it fails to report that the 500,000 shares sold were negotiated by Rooney in two block sales and that these shares were only nonproxy shares.

51. *See* DX 4. Plaintiff asserts that this letter-advertisement is materially false and misleading because it does not divulge the actual positions

letter to shareholders dated November 16 concerning the "sudden attempt to take over your company" by a "Canadian citizen [Rooney]" and a "Philadelphia lawyer [Gittis]." [52] Pantry Pride circulated an additional advertisement and letter on November 19.[53] On November 20, the Committee submitted its proxy statement pursuant to section 14(a) of the Act, 15 U.S.C. § 78n(a) [54] and another letter to the shareholders criticizing Pantry Pride's operating results and compensation plan.[55] Pantry Pride submitted another letter on November 21 criticizing the slate's nominees and supporting its fiscal record.[56] The Committee circulated a letter and supplemental proxy information on November 28 which gave "a closer look" at the fiscal record.[57]

Pantry Pride also supplemented its Proxy Statement with letters to shareholders on November 16 [58] and November 21.[59] The Court notes that most of these letters ended up as full-page advertisements appearing daily in the *New York Times* and the *Wall Street Journal.* [60] New letters from each side to the shareholders have been published this week.[61] Additionally, many newspapers published articles and commentary on the election,[62] and both sides made press statements.[63]

## DISCUSSION

*Preliminary Injunction*

 To obtain a preliminary injunction plaintiff must establish irreparable harm

---

of Dwight Devon and Fred Mandato and that Gittis had agreed to purchase 1,850,000 shares from Devon, not merely 100,000.

**52.** *See* DX 5.

**53.** *See* DX 6. Defendants allege that this solicitation was materially false and misleading because the Committee was characterized as a "small group of dissidents", when it held almost ten times the shares held by management.

**54.** *See* PX 9. Plaintiff asserts that the proxy statement is materially false and misleading because it fails to divulge illegal soliciting by defendants and Landau; the "warehousing" of stock by Rooney; that the estimated $750,000 fee for the proxy contest is too low; the full extent of the Committee's agreements; that each nominee, except Gittis, planned on purchasing less than 5,000 shares of stock; the shortswing profit problem; and the NOL carryforward problem.

**55.** *See* PX 8. Plaintiff asserts that the letter-advertisement is materially false and misleading because (1) it states that the dissidents control 4,025,553 shares (10.7%) but fails to divulge that almost all shares are owned by Dwight Devon; that Philip Devon and the Devon Group have sought to sell these shares as of June 13, 1984; and that the Devon Group's support stems from an undisclosed agreement with Rooney and Gittis to purchase Devon Group stock; and (2) it states that the Committee slate will study Pantry Pride and recommend alternatives to maximize cash flow and will use the proceeds from "such transactions" to repurchase shares but does not divulge the specifics of the plan; that the Committee has already decided to repurchase stock from Devon; that the Committee has agreed to sell off Pantry Pride real estate and place the corporation on the market for sale, and (3) it

asserts that the Committee will make plans and proposals with respect to management and compensation but does not divulge the "set" plans to hire Dwight, Devon, Fred Mandato and Rooney Pace; that the decline in sales, operating profits and earnings are the result of recent corporate changes; and the use of selective stock quotations to portray management in the worst possible light.

**56.** *See* DX 8.

**57.** *See* DX 9.

**58.** *See* PX 25.

**59.** *See* PX 26.

**60.** *See, e.g.,* PX 12.

**61.** *See, e.g.,* N.Y. Times, Dec. 2, 1984, Sec. 3 at 9; Dec. 4, 1984 at D23.

**62.** *See, e.g., Pantry Pride's Heated Battle,* N.Y. Times, Dec. 5, 1984 at D1, col. 3; *Effort to Oust Board of Pantry Pride Turns Foes Into Allies and Vice Versa,* Wall St. J., Dec. 3, 1984, at 59, col. 1; *Pantry Pride Calls Late Dissident Leader a 'Spy',* Palm Beach Post, Nov. 27, 1984, at B9, col. 1; PX 11.

**63.** *See, e.g.,* PX 10. Defendants maintain that plaintiff's press release on November 6, 1984 concerning Philip Devon's death was materially false and misleading because it stated that Devon had no "concrete plans" to improve Pantry Pride and that he had expressed no dissatisfaction with management. Plaintiff maintains that the Devon Group's November 6, 1984 press release and Gittis's and Landau's November 12, 1984 press statements were improper solicitations under section 14(a).

and either (1) a likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in its favor. *See Mitchell v. Cuomo,* 748 F.2d 804, 807–08 (2d Cir.1984); *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.,* 596 F.2d 70, 72 (2d Cir.1979) (per curiam). Plaintiff argues that it will be irreparably harmed if the Court does not enjoin certification of a possible Committee victory. Plaintiff contends that if the dissidents are successful, they could take control of Pantry Pride and mismanage the company thereby jeopardizing the shareholders' investment. Moreover, plaintiff maintains that once defendants take power, they would dismiss this action thereby causing securities violations to go unpunished. Plaintiff additionally contends that the personal interests motivating the proxy contest remain unrevealed. Although it is sympathetic to their position, the Court finds that plaintiff has not established irreparable harm; therefore, the motion for a preliminary injunction is denied.

■ To establish irreparable harm plaintiff must show "the absence of an adequate remedy at law." *Buffalo Forge Co. v. Ampco-Pittsburgh Corp.,* 638 F.2d 568, 569 (2d Cir.1981). As defendants correctly observe, the Court has the power, if defendants' proxies are ultimately found to be in violation of the securities laws, to set aside the election, order defendants to resolicit proxies, or grant other necessary relief. *See J.I. Case Co. v. Borak,* 377 U.S. 426, 433, 84 S.Ct. 1555, 1560, 12 L.Ed.2d 423 (1964). Moreover, if defendants win and attempt to dismiss the lawsuit, the Court can appoint a "trustee" to continue this action. If plaintiff is ultimately correct in its arguments and were to prevail at a subsequent court-ordered election, litigation expenses might be recoupable.

Finally, plaintiff's claims are inconsistent with its limited request for relief. If plaintiff seriously believes that Pantry Pride shareholders have been denied fair suffrage, an injunction against the election, not the certification, is the proper relief.

Although enjoining certification is an alternative deserving of exploration in certain circumstances, *see* III H. Bloomenthal, *Securities and Federal Corporate Law* § 13.17[2] at 13–84 (1984), the Court will not allow plaintiff to eat its cake and have it too by casting a shadow only over defendants. The Court holds, therefore, that plaintiff's motion for a preliminary injunction is denied because plaintiff has failed to establish irreparable harm. Additionally, plaintiff has also failed to satisfy other requirements necessary to obtaining a preliminary injunction.

*Section 13(d)*

■ Section 13(d) of the Act, 15 U.S.C. § 78m(d) requires that any person or group which directly or indirectly becomes the beneficial owner of more than 5% of any registered equity security must file a Schedule 13D with the Securities and Exchange Commission ["SEC"] within 10 days. 17 C.F.R. § 240.13d–1. A "beneficial owner" includes any person with (i) voting power or (ii) investment power over the securities. *Id.* § 240.13d–3(a)(1), (2).

Plaintiff argues that a Rooney-Devon "group" was formed in September 1984 and a larger group emerged in October 1984, thereby making untimely Devon's amended Schedule 13D filed on November 5, 1984. It is clear that once any other shareholder had joined with Philip Devon in furtherance of a common objective with respect to the stock under their control, a 13(d) filing was required. The Court is not persuaded, however, that Devon combined with any Committee members before October 31, 1984. *See Wellman v. Dickinson,* 682 F.2d 355, 363 (2d Cir.1982), *cert. denied sub nom. Dickinson v. S.E.C.,* 460 U.S. 1069, 103 S.Ct. 1522, 75 L.Ed.2d 946 (1983).

The Court agrees with defendants' contention that, although the idea of a proxy fight had been floated among certain individuals previously, defendants did not control 5% of the stock until October 31, 1984 when the Perlmans and Devon executed their agreement. The record reveals that some of the participants in the October meetings were more interested in individu-

al directorships than any joint action. The "withdrawal" of both Goldberg and subsequently MacAndrews from the "group" supports this interpretation. *See Cook United, Inc. v. Stockholders Protective Committee,* [1979 Transfer Binder] Fed. Sec.L.Rep. (CCH) ¶ 96,875 at 95,577–78 (S.D.N.Y.1979). Additionally, Landau affirmed that Devon had not made up his mind to proceed with a proxy contest until October 31, 1984, following a final effort to convince the board to create additional shareholder seats. Section 13(d) allows individuals broad freedom to discuss the possibilities of future agreements without filing under securities laws. That the October discussions were still preliminary is evinced by lingering indecision and independent goals inconsistent with any agreement. *See Todd Shipyards Corp. v. Madison Fund, Inc.,* 547 F.Supp. 1383, 1388–89 (S.D.N.Y.1982).

It may be that Rooney made up his mind to start a proxy contest in as early as mid-October. However, without Devon's stock and acquiesence he would not have exceeded the 13(d) threshold. The argument is meritless that Rooney effectively held 5% voting power because his institutional clients would do his bidding. Rooney Pace only maintains nondiscretionary accounts, and the institutional representatives deposed unanimously state that Rooney could not influence their fiduciary and proxy decisions. Additionally, the "bouncing one million shares" which Rooney allegedly controlled is insufficient to comprise a 5% stakehold.

It is arguable, although based solely on speculation and conjecture, that Devon had joined with Rooney to support a proxy contest by mid-October. The Court is not persuaded that a "group" existed two weeks earlier than disclosed. Moreover, even assuming *arguendo* that such a violation occurred, it would not justify the relief requested by plaintiff. The only prejudice that it could cause plaintiff would be that plaintiff remained ignorant of the proxy challenge for two weeks. Plaintiff in fact had considerable warning of such a fight from Goldberg's and Slovin's requests for

directorships. In such a situation, the Court would consider an application to adjourn the election so that management would have sufficient opportunity to investigate the Committee and make the results of its investigation known to the stockholders. However, plaintiff does not move for any adjournment of the election. Indeed, as a result of this litigation, plaintiff has amassed volumes of information concerning defendants and their nominees for the board of directors, which it freely disclosed to stockholders and the general public, within the limits of the proxy rules.

*False and Materially Misleading Statements*

■ Plaintiff also argues that defendants violated sections 14(a) and 13(d) of the Act by making false and materially misleading oral and written statements and by omitting to state material facts. Initially, the Court notes that even if plaintiff proved materially misleading statements or omissions in a shareholder's 13D filing, proper relief on these facts would be a curative disclosure, not a preliminary injunction. *See Rondeau v. Mosinee Paper Co.,* 422 U.S. 49, 57–65, 95 S.Ct. 2069, 2075–79, 45 L.Ed.2d 12 (1975); *Treadway Companies, Inc. v. Care Corp.,* 638 F.2d 357, 380 (2d Cir.1980).

■ Section 14(a) prevents management or dissidents from obtaining authorization by means of deception or inadequate disclosure in proxy solicitation and reflects the congressional belief that "[f]air corporate suffrage is an important right that should attach to every equity security bought on a public exchange." *Mills v. Electric Auto-Lite Co.,* 396 U.S. 375, 381, 90 S.Ct. 616, 620, 24 L.Ed.2d 593 (1970) (quoting H.R. Rep. No. 1383, 73d Cong., 2d Sess., 13 (1934)); *J.I. Case Co. v. Borak, supra,* 377 U.S. at 431, 84 S.Ct. at 1559. Section 14(a) requires that full and fair disclosure be made to stockholders whose proxies are being solicited so that they can make an "informationally competent" choice among alternatives. *Laurenzano v. Einbender,* 264 F.Supp. 356, 362 (E.D.N.Y.1966); *see*

*Freedman v. Barrow,* 427 F.Supp. 1129, 1145 (S.D.N.Y.1976).

In order to obtain judicial relief for an alleged violation of section 14(a), the false or misleading proxy statement or omission must concern a material fact. *S.E.C. v. Kalvex, Inc.,* 425 F.Supp. 310, 314 (S.D.N.Y.1975). Generally, the test is whether there exists a substantial likelihood that the misstatement or omission will influence a stockholder to grant his proxy to a solicitor or withhold one from the other side, while in the absence of such a statement or omission, the stockholder would have taken a different course. In *TSC Indus., Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976), the Supreme Court defined the standard of materiality as

> substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder. Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.

Although a judicial review of alleged material misstatements or omissions should not become an exercise in "nit-picking", *Kennecott Copper Corp. v. Curtiss-Wright Corp.,* 584 F.2d 1195, 1200 (2d Cir. 1978), several specifics alleged by plaintiff must be examined. Initially, the Court is satisfied that defendants have adequately disclosed their plans and objectives for Pantry Pride's future. Plaintiff alleges that defendants have definite plans to, *inter alia,* sell off supermarkets/real estate, repurchase Devon stock, and place Pantry Pride on the seller's block.

An evaluation of the materiality of the nondisclosure of an anticipated event requires a balancing of both the indicated probability that the event will occur and the anticipated magnitude of the event in the light of the totality of the company activity. *See S.E.C. v. Texas Gulf Sulphur Co.,* 401 F.2d 833, 849 (2d Cir.1968)

(en banc), *cert. denied,* 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969); *Securities & Exchange Comm'n v. Parklane Hosiery Co.,* 422 F.Supp. 477, 485 (S.D.N.Y. 1976), *aff'd,* 558 F.2d 1083 (2d Cir.1977).

After weighing the conflicting assertions, the Court finds that defendants have made ample disclosures by admitting the "possibilities" of plaintiff's future scenarios. As Judge Friendly noted, to require defendants to "confirm" what are only speculative options would be as egregious as pretending that they did not exist: "It would be as serious an infringement of [SEC regulations] to overstate the definiteness of the plans as to understate them." *Electronic Specialty Co. v. International Controls Corp.,* 409 F.2d 937, 948 (2d Cir. 1969). Similarly, plaintiff's request for disclosure of threats posed to the NOL carryforward is based on a chain of events subject to pure conjecture.

The Court also finds that defendants have made a full disclosure of any alleged wrongdoing of its Committee members. A nominee for a directorship is required to disclose material criminal convictions and criminal proceedings pending against him. 17 C.F.R. § 240.14a–101. Plaintiff's request to drag out peripheral investigations into the Perlmans, although relevant, does not constitute securities violations. *Amalgamated Clothing and Textile Workers Union, AFL–CIO v. J.P. Stevens & Co.,* 475 F.Supp. 328, 332–33 (S.D.N.Y.1979). Plaintiff's claim of unbalanced financial disclosure is analogous to the current debate over the federal deficit: one set of numbers, many interpretations. The same principles of free speech, free analysis and free criticism apply to corporate elections as apply to the political forum. The Court will not use section 14(b) to squash legitimate differences of opinion. *See General Time Corp. v. Talley Indus., Inc.,* 403 F.2d 159, 162 (2d Cir.1968) ("hurly-burly of election contests"), *cert. denied,* 393 U.S. 1026, 89 S.Ct. 631, 21 L.Ed.2d 570 (1969). Finally, the Court has examined plaintiff's other alleged misinformations and omissions and finds that they have either been disclosed

by defendants or do not affect the "total mix" of information available to the stockholders. *TSC Indus., Inc. v. Northway, Inc., supra,* 426 U.S. at 449, 96 S.Ct. at 2132.

*Proxy Solicitations*

Plaintiff contends that defendants and their agents solicited proxies in contravention of SEC regulations. Through the use of personal contacts and press releases, defendants allegedly violated the ten-person rule, which requires that proxy statements be filed and given to any person whose proxy is solicited if the total number of persons solicited is more than ten. 17 C.F.R. § 240.14a–2(b). Defendants are prohibited from communicating with Pantry Pride shareholders "under circumstances reasonably calculated to result in the procurement, *withholding* or revocation of a proxy." *Id.* § 240.14(a)–1(f)(iii) (emphasis added). The Committee did not file its proxy statement until November 21, 1984.

Initially, the Court notes that the SEC has been furnished with proxy materials from each side and has taken no action. Although the fact that such materials have been processed by the SEC is "at the most" an indication that they are not false or misleading on their face, *J.I. Case Co. v. Borak, supra,* 377 U.S. at 432, 84 S.Ct. at 1559, SEC inaction is accorded "some weight". *Spielman v. General Host Corp.,* 402 F.Supp. 190, 197 (S.D.N.Y.1975), *aff'd,* 538 F.2d 39 (2d Cir.1976).

Plaintiff alleges that Rooney solicited Devon, Goldberg and eight institutional investors; Devon solicited three investors, and Landau and the other defendants solicited seven other shareholders. Some solicitees were not deposed. Moreover, there is no evidence on the record to satisfy a finding of untimely solicitation. A careful review of the depositions shows that Rooney's conversations were designed merely to assess possible reactions to a proxy fight. Although on a few occasions Rooney appears to have straddled the fine line between gauging the market pulse and drumming up proxy support, there is no hard evidence of his untimely solicitation of more than ten shareholders. *See Plant Indus. v. Bregman,* 490 F.Supp. 265, 267–68 (S.D.N.Y.1980).

The evidence is equally ambiguous as to other solicitations. A scorecard of nominees listed on the Committee's slate of directors, combined with a calculation of probable solicitees, appears to exceed ten shareholders before the November 21st filing. The Court finds, however, that such a defect does not require the drastic relief requested by plaintiff which would send the wrong message to Pantry Pride stockholders. *See D–Z Investment Co. v. Holloway,* [1973–74 Transfer Binder] Fed.Sec.L. Rep. (CCH) ¶ 94,588 at 96,061–62 (S.D.N.Y. 1974).

There has been no showing that anyone was misled by the alleged solicitation of the eleventh shareholder. Although the conversations and statements may have been calculated to result in the withholding of support for plaintiff's slate, the Committee's proxy statement combined with the ample time and enormous discovery in this matter have cured any defects in the original solicitation. The purpose of court-sanctioned enforcement of nonsolicitation provisions is not to frustrate shareholders who wish to exercise their franchise in favor of a proposed change in management, but rather, to ensure that adequate information is disclosed.

Plaintiff has thus failed to show a likelihood of success on the merits of its requests for a permanent injunction and other relief. Finally, although the Court finds that the plaintiff's claims present questions which are fair ground for litigation, plaintiff has not convinced the Court that the equities tip decidedly in its favor.

*Summary Judgment and Sanctions*

The issue before the Court on a motion for summary judgment is whether there exists a triable issue of fact, after drawing all reasonable inferences and resolving all ambiguities in favor of the opposing party. *See Patrick v. LeFevre,* 745 F.2d 153 at 158 (2d Cir.1984); *Hayden Publishing Co. v. Cox Broadcasting Corp.,*

730 F.2d 64, 67–68 (2d Cir.1984). Moreover, the presentation by the moving party of evidence showing the nonexistence of any material fact does not shift the burden of proof to plaintiff, *see Hayden Publishing Co. v. Cox Broadcasting Corp., supra,* 730 F.2d at 68. The plaintiff need only present some showing that there is a question of fact. *See* Fed.R.Civ.P. 56(e); *Applegate v. Top Assocs., Inc.,* 425 F.2d 92, 96 (2d Cir.1970); *Stinson v. Sheriff's Dep't of Sullivan Cty.,* 499 F.Supp. 259, 262 & n. 10 (S.D.N.Y.1980).

 The crux of plaintiff's claims against Stuart Perlman is the allegation that he has a continuing involvement in the dissident group's struggle for control of Pantry Pride and therefore has a duty to disclose certain facts in an amended schedule 13D. Perlman claims that his involvement has ended, that he and his brother, Clifford Perlman, have not decided how they will vote their shares on December 6, and that plaintiff has presented no evidence to contradict this position.

Plaintiff makes no allegation that there is any direct evidence of an ongoing relationship. The direct evidence, in fact, points the other way: The Perlmans signed written agreements with both Devon [64] and Rooney [65] terminating their involvement with the proxy group. Both these agreements were filed in the Perlmans' Schedule 13D or its amendments.[66] Moreover, Perlman, Gittis, Dwight Devon, Landau and others [67] have testified that the Perlmans have not been involved in the proxy fight since those agreements were signed. The statements of defendants and other members of the dissident group are of course not without potential taint. Plaintiff must nonetheless proffer some facts to suggest that these statements are untrue. In the absence of direct evidence plaintiff rests upon a series of circumstantial facts, which it argues present a question of fact as to Perlman's continued involvement. These circumstantial facts are as follows:

1) that the Perlmans at one time had an agreement with Devon to lead the proxy fight and with Rooney to pay its cost and a commission;

2) that the Perlmans terminated that agreement because of potential hindrance to proxy solicitations as a result of the New Jersey Gaming Commission's refusal to give them a casino license;

3) the statement in Philip Devon's 13D Schedule to the effect that the Perlmans had told him that they then intended to vote with the dissidents despite the termination of the agreement to do so, but that they reserved the right to change their minds;

4) that since the termination agreement, all the shares sold by the Perlmans have been ones for which they held no proxies;

5) that there is an affidavit claiming that the Perlmans solicited at least one Pantry. Pride shareholder;

6) that there was a prior relationship between the Perlmans and Rooney and that it continues;

7) that Clifford Perlman met with Dwight Devon at the offices of Skadden, Arps, Slate, Meagher and Flom on November 6;

8) and that Rooney was involved in the purchase and sale of the Perlman stock.[68]

These substantially undisputed facts, although far from conclusive, suggest the existence of an ongoing relationship. Perlman purchased a large quantity of stock with the expectation that he would lead the proxy contest and was then forced to relinquish his position at the head of the fight because of the potentially negative effect that his reputation might have on Pantry

---

64. Affidavit in Support of Perlman's Motion, Exh. 4 (dated Nov. 29, 1984).

65. *Id.,* Exh. 9.

66. *Id.,* Exhs. 5, 7.

67. *See* Memorandum of Law in Support of Defendant Perlman's Motion at 14 (filed Nov. 29, 1984).

68. *See* Affidavit of Barry L. Katz at 8 (dated Nov. 30, 1984); Plaintiff's Memorandum in Opposition to Perlman's Motion at 5–6 (unfiled).

Pride shareholders. This suggests a continued financial interest in the election of the slate put forward by his former group members. The prior relationship between Perlman and Rooney involving the financing of Regent Air as well as their subsequent relationship with regard to the sales of Pantry Pride stock, when taken together with the original Perlman agreement to lead the proxy fight, suggests that there might exist a relationship of mutual trust that would induce Perlman to make an agreement to be a silent partner to the group. Moreover, the fact that Perlman has sold only nonproxy stock suggests that Perlman wishes to retain his voting power in order to continue his support for the group. Clifford Perlman's single meeting with Dwight Devon the day after Philip Devon's death suggests nothing about Stuart Perlman's actions and is perfectly consistent with the explanation claimed by Perlman: that the brothers wished to clarify their decision to withdraw from the proxy fight. However, Philip Devon's statement with regard to the Perlmans' intent to support the group, which appears in the Devon Group's Schedule 13D, suggests that the Perlmans had made an informal commitment to remain sympathetic to the group, at least under certain conditions.

The only disputed fact in the list pertains to the allegation that Stuart Perlman actually did solicit proxy holders on at least one occasion when he allegedly approached Frank and Belle Cohen. This allegation is only supported by the affidavit of Dean Barnett,[69] a lower-level management employee at Pantry Pride. The absence of any affidavit from the Cohens is notable. Assuming the affidavit to be truthful, however, as we must for the purposes of this motion, it presents no evidence of an ongoing relationship between Perlman and the dissident group. The affidavit gives no indication of when the solicitation took place, except that it must have happened before November 6, when the Cohens allegedly spoke with Mr. Barnett. Thus, the approach was most likely prior to the termination of the Perlmans' involvement with the group. The solicitation of the Cohens, however, suggests that the Perlmans' involvement may have been more active than is apparent from the Schedules 13Ds.

Because the plaintiff has alleged facts that suggest an ongoing relationship, although somewhat weakly, the credibility of the interested witnesses has been placed in dispute. Moreover, plaintiff's allegations that Perlman failed to disclose or made material misstatements in his 13D Schedules are also at issue. If the plaintiff can prove the connection of Perlman to the group, disclosure of any agreements would clearly be required. The Court need not consider plaintiff's other claims regarding failure to disclose at this juncture.

The Court recognizes that summary judgment is a drastic remedy, *see Patrick v. LeFevre, supra,* 745 F.2d 153 at 158. In a case of this type, where credibility of the witnesses is at issue and where discovery has been necessarily hasty and primarily focused on other aspects of the case, the Court will not resort to summary determination of the issues. Complex litigation of this sort does not lend itself to summary disposal. As the Supreme Court has stated, "[t]rial by affidavit is no substitute for trial by jury which so long has been the hallmark of 'even-handed justice.'" *Poller v. Columbia Broadcasting Sys.,* 368 U.S. 464, 472–73, 82 S.Ct. 486, 490–91, 7 L.Ed.2d 458 (1962).

■ In light of the foregoing, the Court also finds that the plaintiff's claim was not made in bad faith or for the purpose of harassment. *See Zerman v. Melton,* 735 F.2d 751 (2d Cir.1984); *Nemeroff v. Abelson,* 620 F.2d 339, 348 (2d Cir.1980). Perlman's early involvement in the proxy fight and the uncertainties inherent in accelerated legal disputes of this nature support a finding of good faith prosecution of the claim.

## CONCLUSION

Plaintiff's motion for a preliminary injunction is denied. Fed.R.Civ.P. 65(a).

---

**69.** *See* Affidavit of Dean Barnett [PX 29].

Defendant Perlman's motions for summary judgment and sanctions are denied. Fed.R.Civ.P. 56(b); 11.

The foregoing constitute the Court's findings of fact and conclusions of law. Fed.R.Civ.P. 52(a).

SO ORDERED.