TRANS WORLD AIRLINES, INC., Plaintiff,

v.

Carl C. ICAHN, Aero Limited Partnership, Cardinal Investors Corp., Longview Investors Limited Partnership, Ocelot Associates Corporation, Heron Investors Plan, Inc., Icahn Acquisition Corp., Excalibur Partners, ACF Industries, Incorporated, I.C. Holding Company, Inc., Icahn Capital Corporation, and Icahn Holding Corporation, Defendants.

No. 85 Civ. 3677 (JMC).

United States District Court, S.D. New York.

May 28, 1985.

Skadden, Arps, Slate, Meagher & Flom, New York City (Robert E. Zimet, Marc B. Tucker, Jay B. Kasner, Margaret A. Enloe, New York City, of counsel), for plaintiff.

Weil, Gotshal & Manges, New York City (Dennis J. Block, Irwin H. Warren, Sanford F. Remz, Stephen A. Radin, New York City, of counsel), for defendants.

## MEMORANDUM AND ORDER

CANNELLA, District Judge.

Plaintiff's motions for a temporary restraining order and a preliminary injunction are denied. Fed.R.Civ.P. 65(a), (b).

### FACTS

On May 15, 1985, plaintiff, Trans World Airlines, Inc. ["TWA"], filed a complaint seeking injunctive relief and damages, charging defendants with violating section 13(d) of the Williams Act amendments to the Securities and Exchange Act of 1934 [the "Act"], 15 U.S.C. § 78m(d) ["Section 13(d)"]. TWA is a Delaware corporation with its principal places of business in New York City and St. Louis, Missouri. TWA common stock and securities are traded on the New York and Pacific Stock Exchanges and are registered pursuant to the Act, 15 U.S.C. § 78l. This action arises out of the purchases, beginning in September 1984 and continuing until Monday, May 20, of approximately 25% of TWA common stock

by defendants. Defendant Carl C. Icahn, is a resident of New York, a registered broker-dealer and a renowned master of the corporate takeover game. Icahn controls the defendant companies and partnerships ["Icahn Group" or "Group"]. The sole claim argued before the Court in connection with the instant motions is that defendants have continually failed to disclose their true motivations in purchasing TWA stock and the actions they intend to take if they gain control of the company.

Icahn's attention first focused upon TWA in the summer of 1984 when he met with Sanford Rederer, an expert on the airlines business, to discuss a possible acquisition of Frontier Airlines. Although Icahn did not pursue Frontier Airlines, he and his associate, Alfred Kingsley, also discussed with Rederer the airlines business in general and TWA in particular as a potential target for a takeover. Rederer subsequently prepared for Icahn numerous reports on TWA which were transmitted via Kingsley. The reports discussed the operating costs, cash flow, asset value and flight operations of TWA. They also recommended strategies for increasing cash flow and cash value by disposal of assets or elimination of certain operations, the so-called "feeder lines".

On October 28, 1984, Rederer indicated that he was "more convinced than ever that TWA would be worth much more than its current market value with management prepared to move decisively to rationalize the route system and convert certain of the physical assets to cash."[1] He went on to explain that by "selling $300 to $500 million worth of assets the company would improve its operating results markedly because those assets as deployed are generating net losses."[2] In his earlier "Preliminary Assessment of the Value of TWA," Rederer indicated that he believed "that TWA could improve results measurably by eliminating its non-hub flying," referring to those flights not operating through the airline's St. Louis or New York City hubs.[3] In the same report, Rederer recommended closing the Kansas City maintenance base, selling at least 25 and as many as 35 aircraft by scaling down flights, and selling airport facilities at O'Hare (Chicago), LaGuardia (New York), Philadelphia and Boston, "where TWA once had a major presence but never will again."[4]

The subsequent reports further develop the theme that TWA would be a valuable takeover target only if the operations were scaled down and/or substantial assets of the company sold. Rederer also indicated that by following these steps the anticipated acquisition debt could be repaid within a year. Additionally, he discussed the potential of a leveraged buyout.

The reports recognized that TWA management was pursuing a different plan whereby the assets would be retained and operations expanded.[5] Rederer's most recent report is dated May 1985. Rederer was the only aviation analyst employed by Icahn during this period.

Beginning in September 1984, members of the Icahn Group began buying TWA common stock. The purchases continued through the winter and spring. By April 29, 1985, the Group had obtained 5% of TWA's outstanding stock, thereby triggering the requirement of Section 13(d) that the Group file a Schedule 13D disclosing material information about themselves and

---

1. Plaintiff's Exhibit ["PX"] 2, Letter from Sanford Rederer to Alfred D. Kingsley at 2 (dated Oct. 28, 1984).

2. *Id.*

3. PX 1 at 8. This document is undated and unsigned. Icahn indicated at the hearing that it was submitted by Rederer.

4. *See id.* at 9.

5. *See* PX 5, Letter from Rederer to Kingsley at 2 (dated Nov. 30, 1984). *See also* PX 11, Letter from Rederer to Kingsley at 1 (dated Apr. 11, 1985) (indicating that TWA "may be considering development of a second domestic hub and are also seeking to expand their transatlantic services through gateways other than New York .... They probably are planning for Spring 1986 expansion, so that it would be important to gain control of the company before those plans are turned into significant cash outlays.").

their intentions. Defendants timely filed their original 13D on May 9, 1985.

During the preregistration period, Icahn clearly intended to pursue the Rederer plan in at least a general way. Icahn testified that he liked the plan because it permitted him to acquire an airline, an industry which he considered to be generally undervalued, without liquidating the entire company after acquisition. He claims he has never favored liquidation plans and that he does not want to have the image of a liquidator. In Icahn's opinion, Rederer's plan called for sale of a limited and unproductive part of TWA's business, while permitting an increased cash flow following the reduction of assets and operations.

On May 3, following the April 29 triggering date, but prior to the Schedule 13D filing, Icahn met for the first time with TWA management. At the meeting, arranged by Drexel Burnham Lambert Inc., Icahn met with Carl E. Meyer, President and Chief Executive officer of TWA. Several associates, legal and financial advisors from each side were also present. Icahn made several suggestions for changes at TWA including the Rederer plan as well as a leveraged buyout. The TWA representatives strongly disputed the feasibility of the Rederer plan or the accrual of additional debt by the airline. Meyer indicated that TWA management had previously studied similar possibilities and rejected them.

On May 5, a second meeting took place, this time with Rederer present to defend his plan. In Icahn's words, the TWA representatives "really tore the plan apart and I think did a pretty good job of [it]." [6] Icahn claims that he then abandoned the Rederer plan. The next day, Icahn spoke by telephone with a second aviation consultant, David Campbell. Campbell focused his analysis of TWA on the labor situation. He recommended the creation of a two-tier contract system similar to that used by American Airlines. The Campbell program would also require the layoff of 2000 em-

ployees, a 7% reduction of workforce, apparently through severance agreements. It would result in a 10% reduction in salaries, because of the introduction of the two-tier system. He did not recommend the sale of assets or the elimination of operations.

In his testimony before the Court, Icahn indicated that he did not think the Rederer plan was very different from the Campbell plan because both sought ways to increase the cash flow without fully liquidating the company. He suggested that Rederer also believed that if labor costs could be reduced the company should be expanded. Icahn claimed that he never really was fully committed to the Rederer plan because it required the elimination of operations, but he thought it was better than total liquidation. He preferred the Campbell plan because no operations would have to be shut down.

A third meeting just between Icahn and Meyer took place on May 7. Meyer and Icahn agree that the discussion continued to turn around possible plans for increasing cash flow and for a leveraged buyout. Meyer does not claim that Icahn persisted openly with his plan to sell assets or eliminate operations, but that such an intent could be inferred from Icahn's resistance to TWA's current plans for rapid expansion and purchase of new aircraft.

Icahn stated at the hearing that he does not necessarily oppose the TWA plan for expansion and purchase of airplanes, but believes that TWA could pursue the plan and still carry an additional $200 million of debt. He believes the acquisition debt can be funded either by TWA cash flow or additional debt or by ACF Industries Inc., ["ACF"], a member of the Icahn Group and previous takeover acquisition by Icahn. A final meeting between Icahn and Meyer took place on May 15, apparently similar in substance to the May 7 meeting. It was clear by this time that TWA management did not want Icahn to control TWA.[7]

6. Transcript of May 24 Hearing at 60.

7. Icahn testified that his impression was that TWA management was opposed to the Group's proposals. *See id.* at 58–59, 64–66, 85. Shortly

In addition to their original Schedule 13D, defendants have filed three amended schedules. The original May 9 schedule indicates that the Group's purpose in acquiring stock was to take advantage of an undervalued company. They indicated that they had consulted with TWA management and intended to continue to do so. They disclosed that they had originally held the view that substantial funds could be derived from the elimination of domestic flights and the sale of airplanes, but had rejected the idea after discussions with management. They indicated that they might seek control by means including merger or acquisition of stock, by tender offer or other methods. The first amendment, filed on May 14, 1985, made no substantial changes relevant to this motion. The second amendment, filed on May 16, stated that Icahn had met with Meyer to discuss business combinations that would result in Icahn control and that the Icahn Group was actively exploring control "to protect our substantial equity interest" in light of TWA management's hostility to Icahn's suggestions. They indicated that although they intended to pursue acquisition by means of tender offer, proxy, purchase of shares or otherwise, they did not guarantee that they would do so.

Before the third amendment was filed on May 23, Icahn announced, on May 21, a proposed cash merger whereby the Icahn Group would purchase all remaining outstanding shares of TWA at $18 per share. Icahn indicated that ACF and its affiliates would produce $400 million in cash of the $600 million required. He stated that he was so certain the other $200 million would be forthcoming that he promised TWA a two-year standstill if he could not raise it expeditiously. Icahn also indicated that the Group would not accept any offer by TWA to purchase the Group's shares unless the same offer were made available to all shareholders, thus apparently ruling out a "greenmail" option.[8] Finally, he announced the commencement of a consent procedure to remove the TWA Board of Directors in the event that the Board declined to put the cash merger proposal to a vote. He stated that the Group's shares would be voted with the majority decision of the remaining shareholders in a cash merger vote.

The third Schedule 13D reflected these new proposals and also indicated that Icahn intended to operate TWA in its long term interest and that of its employees and the travelling public. He disclosed that if he acquired control, he intended to change the Board of Directors and review assets, operations, properties, policies and management. Icahn indicated that the Group had determined not to eliminate domestic flights, sell assets or conduct a leveraged buyout, but that the sale of some assets might become necessary to pay back acquisition debt if the cash flow is insufficient.

The day after filing the complaint in this Court, TWA filed a complaint alleging state law violations in the Circuit Court of the County of St. Louis, Missouri. *See* Petition for Declaratory and Injunctive Relief, Cause No. 525256 (Cir.Ct.Mo.) (filed May 16, 1985). On that same day, TWA made an application to the United States Department of Transportation for an inquiry into Icahn's fitness to operate an airline. A conference was held in this Court on Friday May 17, to arrange a discovery schedule. Pursuant to the schedule agreed upon by the parties, discovery was to be expedited and a preliminary injunction hearing held on June 6. Although defendants requested TWA to agree not to use this discovery in

---

thereafter, this impression was borne out by the lawsuits and administrative action filed, as well as a full page advertisement in the *New York Times* criticizing Icahn and his fitness to run TWA. *An Open Letter to Carl Icahn*, N.Y. Times, May 20, 1985 at D4.

**8.** The Court notes that the recent ruling in *Unocal Corp. v. Mesa Petroleum Co.*, 493 A.2d 946

(Del.1985) (business judgment rule gives wide latitude to corporate directors), suggests that TWA, at least under Delaware law, would be able to exclude the Icahn Group's shares from a securities exchange offer to the remaining shareholders through a form of reverse greenmail.

the Missouri action and to bring any motion in this Court first, plaintiff declined to make such a promise and indicated that no decision had been made as to any motion in the Missouri action.

On Monday May 20, however, plaintiff brought on a motion for temporary restraining order by order to show cause in St. Louis. Because defendants received notice too late for their New York attorneys to get to St. Louis for the hearing, they were represented by a St. Louis firm. After hearing argument, the St. Louis judge, the Hon. Bernhardt C. Drumm, Jr., indicated that he favored entering a limited restraining order but that he thought the state action more properly belonged as a pendent matter in the Southern District of New York. At this point, defendants offered to refrain from further purchases of stock and thus maintain the status quo until this Court had had a chance to rule on the motion. TWA agreed, and arrangements were made with this Court for a hearing on a motion· for a temporary restraining order the following morning, May 21.

At the May 21 hearing, defendants were ready to defend on state as well as federal claims, but plaintiff declined to raise the Missouri state law claims in this Court. Following brief argument, the Court and the parties had a discussion on the possibility of further expediting discovery and moving up the June 6 hearing date. The St. Louis agreement was accordingly extended pending an evidentiary hearing on the preliminary injunction motion to be held on Friday, May 24, and the Court reserved decision on the temporary restraining order. *See* Order, 85 Civ. 3677 (JMC) (S.D. N.Y. May 21, 1985). It was revealed for the first time at the May 21 hearing that Icahn had offered to pay for a cash merger at $18 a share. There was no discussion at that time as to whether the offer was a breach of the St. Louis agreement. The Court ordered defendants to file an amended Schedule 13D to reflect the cash merger offer.

On the afternoon of May 21, the parties reappeared before the Court to discuss the full scope of the now public announcement by Icahn of the cash merger proposal and consent procedure. The Court found that there was no violation of the St. Louis agreement. It also declined to enter a temporary restraining order precluding defendants from pursuing the consent procedure, without prejudice to renewal of the motion at the May 24 hearing or thereafter, if any issue had developed as to the propriety of the consent procedure.

On May 24, the preliminary injunction hearing was held. Icahn and Meyer both testified, and numerous documents including the Rederer reports were entered into evidence. TWA raised only one core issue at the hearing and in its papers: whether defendants had improperly failed to disclose that their actual and present intent includes a plan to sell substantial TWA assets and/or eliminate domestic operations. After the close of the hearing, TWA raised a new argument: that Icahn had improperly failed to disclose his intent to remove Meyer as President of TWA. The Court then announced that it would reserve decision on the motions and would issue its written decision by 11:00 a.m. on Tuesday, May 28, the next business day following the Memorial Day weekend.

## DISCUSSION

■ To obtain injunctive relief plaintiff must establish irreparable harm and either (1) a likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in its favor. *See 754 Orange Ave., Inc. v. City of West Haven, Connecticut,* 761 F.2d 105, 110 & n. 2 (2d Cir.1985); *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.,* 596 F.2d 70, 72 (2d Cir.1979) (per curiam); *Crown Zellerbach Corp. v. Goldsmith, et al.,* 609 F.Supp. 187, 188–189 (S.D.N.Y.1985). In determining whether there will result irreparable harm in the absence of injunctive relief

requested, the Court must examine the adequacy of the legal remedies. *See Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 506–07, 79 S.Ct. 948, 954–55, 3 L.Ed.2d 988 (1959). Additionally, in an action based upon an alleged violation of Section 13(d), the focus is on harm to the shareholders and investing public, not management, because the "purpose of the Williams Act is to insure that public shareholders who are confronted by a cash tender offer for their stock will not be required to respond without adequate information regarding the qualifications and intentions of the offering party." *Rondeau v. Mosinee Paper Corp.*, 422 U.S. 49, 58, 95 S.Ct. 2069, 2075, 45 L.Ed.2d 12 (1975). Courts have held that a continuing failure to disclose material information on a Schedule 13D will result in irreparable harm because it precludes the shareholders from obtaining "important and legally required information as to the acquiring group's intentions which may affect their judgment as to whether the stock should be sold, bought, or held." *Marshall Field & Co. v. Icahn*, 537 F.Supp. 413, 416 (S.D.N.Y.1982); *see also Kaufman and Broad, Inc. v. Belzberg*, 522 F.Supp. 35, 46 (S.D.N.Y.1981). Any prior inadequate disclosure subsequently corrected will not give rise to irreparable harm, however, because an adequate remedy exists at law. *See Rondeau*, 422 U.S. at 59, 95 S.Ct. at 2076; *Belzberg*, 522 F.Supp. at 45.

Accordingly, the question before the Court is whether there is any continuing violation of Section 13(d). Among the purposes that must be disclosed pursuant to Section 13(d), are "(c) A sale or transfer of a material amount of assets of the issuer ...; (d) Any change in the present board of directors or management of the issuer ...; (f) Any other material change in the issuer's business or corporate structure ...." 17 C.F.R. § 240.13d–101 (1984); *see GAF Corp. v. Milstein*, 453 F.2d 709, 717 (2d Cir.1971), *cert. denied*, 406 U.S. 910, 92 S.Ct. 1610, 31 L.Ed.2d 821 (1972). There is little question that if Icahn intends to sell

material assets of TWA or dispense with domestic flights, he is required to so state in his Schedule 13D.

In his most recent 13D, Icahn states that defendants had "previously considered the possibility of eliminating some of [TWA's] domestic flights and selling certain planes; however, the [defendants] have been advised by [TWA's] management, and believe, as previously reported in this Schedule 13D, that such a strategy would not be feasible."[9] They warn, however, that if TWA's earnings and cash flow are insufficient to pay any debt incurred in acquisition, they "would explore alternative financing sources, including the possible sale of assets of [TWA]."[10]

Icahn has, therefore, expressly disavowed any fixed plan to sell assets or eliminate operations. He has, however, disclosed the possibility that certain assets might be sold if necessary to repay acquisition debt. The factual issue before the Court then is whether, despite his denial, Icahn in fact maintains the intent to sell substantial assets or dispose of local operations without regard to the availability of other sources of cash or debt for repayment of acquisition costs.

It is readily apparent from the evidence before the Court that Icahn came into the TWA gambit entertaining as a primary plan the sale of assets and discontinuance of domestic flights. Rederer's numerous reports, as well as the testimony of both Icahn and Meyer, make it clear that Rederer's plan was foremost in Icahn's mind at least until May 5. Icahn states that he gave up the plan after the May 5 meeting and felt even more convinced of its inadequacy after speaking with Campbell. Plaintiff argues that it is incredible that Icahn would so quickly discard the voluminous reports of his own consultant upon the word of TWA management, for whom Icahn seems to have little respect and whom *Fortune Magazine* recently credited with managing the third least admired ma-

---

**9.** Amendment No. 3 to Schedule 13D at 16.  **10.** *Id.*

jor corporation in America.[11] Plaintiff also argues that it is unlikely that, after spending only two hours on the phone with Campbell, Icahn would rely upon his statements, many of which Icahn had not confirmed by the time the third Schedule 13D amendment was filed. Finally, plaintiff argues that Icahn's prior record of raiding corporate assets after acquisition, as well as his prior brushes with securities law violations, impeaches his credibility.[12] Meyer does not claim, however, that Icahn discussed the Rederer plan at the last two meetings.

The Court has reviewed the record and listened to the testimony and finds Icahn to be credible. It is not unreasonable for him to have changed his mind after having his consultant's report heavily criticized by the people who had been running TWA in recent years and who had, themselves, had a similar report made recently, which indicated that to sell off planes and discontinue routes would be disasterous for the company. That Icahn may replace some of the existing management with his own choices does not mean that he has no respect for any of their decisions or opinions. Moreover, the nature of the fast moving takeover battle requires quick and semi-intuitive decisions. As Icahn testified, he often operates by seat of the pants instinct in these situations. Thus to make a decision based in part upon an essentially unsubstantiated oral report by Campbell is not an impossibility. Nor can the Court infer from his past conduct that Icahn has a particular pattern or gameplan that necessarily or even most likely implicates the sale of major assets or a "greenmail" attempt. Evidence that Icahn may have sold substantial assets or divisions of previously acquired companies on two occasions is some evidence of his current intent. It does not overcome, however, the explicit and public statements made repeatedly by Icahn in his Schedule 13D, on the stand, in the press, and in recent letters to Senator John C. Danforth, Chairman of the Senate Committee on Commerce, Science and Transportation, and Congressman James J. Howard, Chairman of the House Committee on Public Works and Transportation.[13] The Court finds it unlikely that such a skilled businessman would make such public announcements concerning a corporation with such a visible profile if he did not intend to carry out his stated plans. At this time, the Court is not convinced by the highly attenuated circumstantial inferences TWA puts forth.

TWA's most recent argument is that Icahn, having disclosed in his testimony that he may replace Meyer as President, must also disclose this plan on his Schedule 13D. There is of course authority, aside from the plain wording of Section 13D, that disclosure of plans to replace management must be disclosed. *See Gulf & Western Indus., Inc., v. Great A. & P. Tea Co.,* 476 F.2d 687, 696–97 (2d Cir.1973).

Icahn, as noted above, has disclosed that he intends to remove the Board of Directors, of which Meyer is a member, and to review the management of the company if he gains control. The Court is mindful

---

**11.** Defendants' Exhibit ["DX"] B, FORTUNE MAGAZINE, *At the Top and Bottom of the 250 Companies,* Jan. 7, 1985, at 19.

**12.** Plaintiff claims that of all Icahn's prior takeover attempts, only two have resulted in actual takeovers—ACF and Baird & Warner Mortgage Realty Investors. It is claimed that in each of these cases Icahn subsequently sold off substantial assets of the corporation to further his investment goals.

**13.** *See* DX A (dated May 22, 1985) ("Please rest assured—despite the publicity campaign that has been mounted against me—that I am fully committed to the long term interests of TWA. I personally believe that the airline industry will continue to grow and that a well managed TWA could turn around and become the leader in this deregulated environment. Thus, it is my intention to cause the airline to be operated on an on-going basis by experienced and competent managers. I have absolutely no plans or intentions to liquidate TWA's business or its fleet of planes or to cause widespread layoffs or to curtail its routes or its St. Louis or Kansas City facilities. You might find it ironic that protection is being sought from Congress and the Administration by TWA's current management, which in the last five years has shrunk the size of the airline and reduced its workforce by 12,000 people (about 30%).").

of the Second Circuit's recommendation that the evaluation of adequate disclosure not be turned into an exercise of judicial "nit-picking". *Kennecott Copper Corp. v. Curtiss-Wright Corp.*, 584 F.2d 1195, 1200 (2d Cir.1978) (discussing adequacy of proxy disclosure); *see Pantry Pride, Inc. v. Rooney*, 598 F.Supp. 891, 901 (S.D.N.Y.1984). Here, Icahn has disclosed his intent to review management and to remove Meyer as a Board member. To require him to file an additional 13D to disclose that he may replace one member of management and is considering others is premature. The Court, of course, would expect that if Icahn comes to any more firm decisions on this subject, and particularly if he intends to make wholesale changes in management, he will file an amended 13D expeditiously.

Accordingly, the Court finds that there is no material violation of Section 13D that is ongoing at this time. It makes no decision with respect to any prior violations, currently corrected, because any such violations would be adequately remedied in an action for damages. Because plaintiff has failed to show probable success on the merits of any continuing violation, or even serious questions going to the merits of such a claim, there is no irreparable harm and no injunction may issue.

### CONCLUSION

Plaintiff's motions for a temporary restraining order and a preliminary injunction are denied. Fed.R.Civ.P. 65(a), (b).

SO ORDERED.