INTERNATIONAL BANKNOTE
COMPANY, INC., Plaintiff,

v.

N. Norman MULLER, et al.,
Defendants.

Thomas SMITH, individually and on behalf of a Shareholders' Committee of International Banknote Company, Inc., Plaintiff,

v.

INTERNATIONAL BANKNOTE
COMPANY, INC., et al.,
Defendants.

No. 89 CIV 2272 (KMW).

United States District Court,
S.D. New York.

May 3, 1989.

Conrad K. Harper, Robert A. Bourque and Tom Agnello, Simpson, Thacher & Bartlett, New York City, for plaintiffs.

Richard M. Resnik, Stanley M. Kaufman, Peter Raymond and Arthur Handler, Golenbock & Borell, New York City, for defendants.

MEMORANDUM OPINION

KIMBA M. WOOD, District Judge.

Before this Court are the parties' motions for preliminary injunctive relief for alleged violations of federal securities laws and New York common law.[1] Plaintiff International Banknote Company, Inc. ("IBC" or the "Company") seeks to enjoin defendant shareholders and all others acting in concert with them, from: (1) purchasing additional shares of IBC stock; (2) voting in person or by proxy any IBC shares at the May 25, 1989 shareholders' meeting, or (3) soliciting any proxies with respect to IBC shares for the election of directors at the May 25, 1989 shareholders' meeting. Plaintiff also seeks a declaration that the Company be permitted to refuse to recognize any votes cast by or on behalf of defendants and all others acting in concert with them.

Defendants seek a preliminary injunction enjoining the enforcement of a recently enacted corporate by-law (the "By-law") that requires 45 days notice prior to submitting a nomination to IBC's Board of Directors (the "Board"). Defendants also seek to enjoin plaintiff from issuing improper proxy solicitations.

For the reasons stated below, plaintiff's motion for an injunction and for declaratory relief is denied; defendants' motion to enjoin enforcement of the By-law is granted, and defendants' motion to enjoin plaintiff from disseminating illegal proxy solicitation is denied.

I. *Procedural History*

On April 5, 1989, IBC filed its complaint alleging that defendants violated sections 13(d) and 14(a) of the Securities Exchange Act of 1934 (the "1934 Act"), 15 U.S.C. § 78m(d) and 78n(a). The Court granted plaintiff's request for expedited discovery at a hearing in this matter on April 6, 1989.

On April 7, 1989, defendants filed a separate action alleging that IBC's recently en-

1. For purposes of this Opinion, the plaintiff in Action No. 1 and the defendants in Action No. 2 are referred to hereinafter as "plaintiff"; the defendants in Action No. 1 and plaintiff in Ac- tion No. 2 are referred to hereinafter as "defendants." By Order of April 19, 1989, these two actions were consolidated before this Court.

acted By-law violated the 1934 Act as well as New York common law and alleging that IBC violated the SEC proxy solicitation rules (Rules 14a–6 and 14a–9, 17 C.F. R. § 240.14a–6 and § 240.14a–9) by issuing several press releases on April 6, 1989 containing false and misleading statements about defendant N. Norman Muller. Defendants moved this Court on April 7, 1989 for a Temporary Restraining Order enjoining plaintiff from enforcing the contested By-law pending a decision on the motions now before the Court. Following a hearing on April 7, 1989, the Court issued an order temporarily restraining plaintiff from enforcing the By-law and directing that the parties proceed with expedited discovery in both actions. The Court extended the TRO for an additional 10 days on April 19, 1989. On April 24, 1989, the Court heard oral argument on both preliminary injunction motions.[2]

## II. *Background*

Plaintiff IBC is a New York corporation with its principal place of business in New York City. Complaint in Action 1 at ¶ 4. IBC is engaged through its subsidiaries in the design, engraving and printing of stock certificates, currency, stamps and food coupons and in the design and manufacture of holograms and holographic products. IBC's shares are traded on the American Stock Exchange and the Philadelphia Stock Exchange. *Id.*

The individual defendants are for the most part IBC shareholders who organized the Shareholders' Committee of International Banknote Company, Inc. (the "Committee"). The Committee has announced its intention to seek the removal of the incumbent IBC Board of Directors. Schedule 13D, Harper Aff. at Ex. D. As of April 24, 1989, the Committee held beneficial ownership of approximately 11.7 percent of the outstanding shares of IBC and the Committee's shares were worth an estimat-

ed $9.1 million. Transcript from January 24, 1989 preliminary injunction hearing ("Hearing") at 86.

Defendant N. Norman Muller, a New York resident, is a "consultant" to the shareholders committee, hired at a flat fee of $50,000 plus expenses. Muller at 131–141.[3] He is currently a director and the President of defendant Admiral Capital Corporation ("Admiral"), a company that purchases leases, *Id.* at 12; a consultant to defendant Dorian Industries, Inc. ("Dorian")[4], which is a consultant service owned entirely by Muller's daughters, *Id.* at 9; and the President of GBI International Industries, Inc. ("GBI"), a public corporation engaged in the industrial insulation business. *Id.* at 15.

Defendant Thomas Smith, a Texas resident, is the Vice President and Chief Financial Officer of Admiral and the Chief Financial Officer of defendant Double Helix Films, Inc. ("Double Helix"). Pursuant to the Shareholders' Committee Agreement (the "Agreement") adopted on March 15, 1989, the Committee appointed Smith "coordinator" of the Committee and gave him the power to direct the vote of all the shares of the members of the Committee. Smith at 213–215.

Defendant Arthur E. Bohrer, a New Jersey resident, has been in the wholesale food business for 40 years and has been a shareholder of IBC for more than three years. Bohrer at 13–17, 21, 59.

Defendant Robert Hesse, a New Jersey resident, is a former investment banker. He was recently named Chief Executive Officer and Chairman of the Board of Beafuels Inc., a coal mining company located in Georgia. Hesse owns 30 percent of Admiral. Schedule 13D, Harper Aff. at Ex. D.

Defendants Jerry Silva, a New York resident, and Stanley Wakefield, a New Jersey resident, are, respectively, Chairman of the

---

**2.** The Court gave both parties the option of presenting live testimony before the Court. Neither party chose to do so.

**3.** Hereinafter, references to deposition testimony of all witnesses will be referred to by the last

name of the witness followed by the transcript page number.

**4.** Dorian owns approximately 50 percent of Admiral, and owns approximately 16 percent of the shares of defendant Double Helix Films, Inc.

Board and Chief Executive Officer of Double Helix. Silva owns approximately 30 percent of the common stock of Double Helix.

Defendant William Kunz, a New Jersey resident, is vice president of sales of H.H. Cutler Co., a children's clothing company located in New York City.

Defendant Millard Chiang is the sole proprietor of Transnational Capital Corporation, which is in the business of global trade financing. Chiang at 10.

Defendant Tsunesaburo Kurosawa is a Japanese businessman and is President and controlling shareholder of defendants Kurosawa Co., Ltd., and T. Kurosawa Co., Ltd.[5]

Defendant Tai Tsuchiya is a Japanese attorney.

Defendants C.C. Tung and Michael Wang are the sole shareholders and the President and Vice President, respectively, of defendant Panacrown Limited ("Panacrown"), a Hong Kong corporation.

The following are the Court's findings of fact and conclusions of law:[6]

The events leading up to the formation of the Committee begin with a conversation between defendants Muller and Hesse. Muller testified that Hesse, a former investment banker, identified IBC as an "undervalued" company in December of 1988. Muller at 30. Hesse had begun to purchase IBC stock in December and continued purchasing the stock in January and February. Hesse Schedule 14B, Harper Aff. at Ex. T. In January 1989, Hesse, at Muller's request, provided Muller with additional information about the Company. Muller at 31–33.

In late December of 1988, Muller had a dinner party at his home and mentioned IBC to defendant Jerry Silva as something he wanted Silva to "look at." Silva at 16. Muller gave Silva IBC's annual report and Form 10–K and an article on the Company's management. Id. at 16–17; Muller at 55.

Muller next discussed IBC with defendant Chiang, referring to the stock as "underrated," Muller at 68, Chiang at 20, and with defendant Thomas Smith, a business associate who works out of the same offices in New York City. Smith at 116–117. Muller testified at his deposition that he asked Smith to look into the Company and give him his "opinion." Muller at 37. Smith testified that he reported back to Muller that the Company was "abysmally managed." Smith at 57.

Also in January 1989, Muller formed defendant Dorian Industries, Inc.—a consultant service owned entirely by his two daughters. Dorian has been retained as a consultant to the Committee. Dorian owns 50% of the stock of defendant Admiral Capital and Hesse owns 30% of the stock of Admiral Capital. Schedule 13D, Harper Aff. at Ex. D.

Around the end of January or the early part of February, Muller asked Smith to prepare a written research report on IBC. Muller at 37; Smith at 52. Smith testified that he prepared the report (hereinafter the "Smith Report" or the "Report") himself, using only publicly available information

---

5. As of April 24, 1989, Mr. Kurosawa had not been served with process in this action.

6. Because the record presently before the Court is incomplete and discovery is on-going, and because determination of several factual issues must await the Court's assessment of the credibility of witnesses who have not appeared before the Court (and in some cases, have not yet been deposed), the Court is not prepared to make detailed findings of fact at this time. In deciding these motions, however, the Court has drawn certain inferences from those facts that are undisputed and has assumed other facts as true for purposes of assessing the possible irreparable harm to both parties.

On April 26, two days after the conclusion of the hearing in this matter, plaintiff sought to submit to the Court voluminous additional materials, including affidavits, deposition transcripts and legal memoranda. Defendants shortly thereafter requested an opportunity to respond to these additional submissions. In a telephone conference with the parties on April 27, 1989, the Court ruled that in order to issue an expedited decision (as both parties requested), the Court would not accept these additional submissions. This Opinion is thus based on the record as of April 24, 1989.

such as public filings and articles in trade publications. Smith at 49, 70. Smith completed the Report at the end of the first week or beginning of the second week of February 1989. Smith at 60.

The Smith Report includes 18 pages of text and charts plus an inch thick appendix containing IBC's 1987 Annual Report, IBC's September 30, 1988 10–Q filing, and an assortment of articles on the Company. Smith suggest in the first paragraph of the Report that the Company offers investors "a unique opportunity to achieve significant near-term profits...." He recommends in the same paragraph that in order to achieve these profits, "it will be necessary to acquire an equity position in International [Banknote] large enough to influence the company's management to redeploy the company's assets."

Smith blames the Company's recent weak performance on "poor, inattentive management," *Id.* at 7, and makes clear what is required to make the Company more profitable. Under the section captioned "Proposed Strategy," Smith states:

> [i]t will be necessary for the shareholders to force a change in the direction of the company. This may be accomplished most rapidly by obtaining an equity position with adequate votes to replace all or at least a substantial portion of the company's board of directors at the company's annual meeting. This will require rapid action since the meeting is to be held in late May 1989....
>
> The management of the company must be changed. It is imperative that new, innovative and aggressive management be put in charge of the company. The new management must be given the charge to maximize the value of the company by taking advantage of the many opportunities now open to it by virtue of its lead in holographic technology.

*Id.* at 10. Not surprisingly, plaintiff refers to the Smith Report as the "smoking gun" that demonstrates the defendants' unequivocal intention to wage a proxy fight several weeks before the Committee filed its Schedule 13D in late March. Plaintiff's Reply Memorandum of Law ("Reply Memorandum") at 7. Smith admits that he and Muller discussed the possibility of waging a proxy fight when they first reviewed the Report but states that it was only an option. Smith at 63.

During the first two weeks of February, Muller discussed IBC for the first time with several of the other defendants. Hesse had met Arthur Bohrer, a longstanding IBC shareholder, at a dinner party of a mutual friend in December. In the course of a general discussion on the stock market, IBC was briefly mentioned. Bohrer at 22. Two or three weeks later, Hesse called Bohrer, inquired whether he still owned his IBC stock, and invited him to dinner at a restaurant in New Jersey. *Id.* at 23–24. Bohrer arrived at the restaurant expecting only to meet with Hesse, but found that Hesse was accompanied by Muller and Silva, neither of whom he had previously met. *Id.* at 25. Bohrer testified that he did most of the talking about the Company at the dinner. He told his dinner companions that he had expressed dissatisfaction with the Company's management in the past at stockholders' meeting and in numerous telephone calls with IBC directors Eugene Jonas and Edward H. Weitzen. *Id.* at 30. Bohrer denies that there was any discussion during the dinner about a proxy contest or about working with other people to change management. *Id.* at 31.

On February 10, 1989, Admiral (of which Muller is President), and Smith made their first purchases of IBC stock. Schedule 13D, Harper Aff. at Ex. D. On February 12, 1989, Muller travelled to Japan with defendant Millard Chiang. Muller testified that he went to Japan primarily in connection with his work as a consultant for defendant Double Helix Films and sought to interest a Japanese businessman, defendant Tsunesaburo Kurosawa, in acquiring Double Helix's film distribution rights in Japan. Muller at 80. Chiang testified that Kurosawa had been recommended to him by Mike Shirota, a broker in the New York office of Wako Securities, a Japanese securities firm, and that he, in turn, suggested to Muller that they should speak with Kurosawa about the purchasing the Double

Helix film distribution rights and about investments in American companies. Chiang at 30–31. Muller took copies of the Smith Report with him to Japan and showed it to Chiang for the first time on the plane going over. *Id.* at 24; Muller at 77–78. Chiang testified that he read the entire Smith Report on the plane, Chiang at 29–30, and that he and Muller did not discuss a possible proxy contest for control of the Company. *Id.* at 25–26.

Muller and Chiang met with Kurosawa twice during the week they were in Japan. At the first meeting, Muller gave Kurosawa a copy of the Smith Report. Chiang testified that there was no discussion of changing management, *Id.* at 35, and could not recall a single bad thing that was said about the Company. *Id.* at 37. The second meeting was held at the request of Kurosawa. According to Muller, there was again no discussion of waging a proxy contest. Muller at 96–99. Kurosawa asked Muller several questions about IBC, especially regarding its holographic business. *Id.* at 95–97. Defendant Tai Tsuchiya, a Japanese lawyer who Muller retained while in Japan, attended the second meeting primarily to act as Muller's interpreter. *Id.* at 94. Chiang testified that he believed Muller also showed Tsuchiya a copy of the Smith Report. Chiang at 44–45.

The Committee's Schedule 13D reveals that defendant Kurosawa Company, Ltd. ("KCL"), a company controlled by Kurosawa, began purchasing IBC stock on February 15, 1989, while Muller and Chiang were still in Japan. Schedule 13D, Harper Aff. at Ex. D. Muller testified at his deposition, however, that at the conclusion of his second meeting with Kurosawa, he did not know whether Kurosawa intended to purchase IBC stock. Muller at 98. Defendant Double Helix Films, at the direction of its President, Silva, began to purchase IBC stock on February 17, 1989. Chiang's wife purchased IBC stock on February 24, 1989, *Id,* and later assigned her voting rights to Chiang. Chiang at 86.

Muller and Chiang went from Japan to Hong Kong, where they met defendants Tung and Wang at a large dinner party.

*Id.* at 125. Tung and Wang are each 50 percent shareholders in defendant Panacrown Ltd. Schedule 13D, Harper Aff. at Ex. D. Muller told Tung and Wang about his meeting with Kurosawa and showed them a copy of the Smith Report, which they kept overnight.

Muller and Chiang returned to New York on February 26, 1989. Chiang at 57. Panacrown (which is owned by Tung and Wang) made its first purchase of IBC stock on February 28, 1989. On that same day, KCL purchased an identical large block of IBC stock. On the next day, March 1, 1989, KCL, Panacrown, and Double Helix each bought an identical large block of IBC stock. In just these two days, more than one percent of all the outstanding shares of the Company were bought by KCL and Panacrown. Hearing at 62.

Purchases of large blocks of IBC stock occurred again on two separate occasions: March 9 (KCL and Double Helix, who purchased an identical block of stock) and March 10, 1989 (KCL and Panacrown, who purchased a identical block of stock). Furthermore, KCL, Panacrown, Double Helix, Chiang, and Tsuchiya all made purchases through one broker at Smartwood Hesse, Inc., a small brokerage firm in New York City which, until last year, was the employer of defendant Hesse. Transcript at 67; Reply Brief at 16 n. 8. Smartwood Hesse's offices are also located at the same floor of the same building as the offices of Muller, Smith, and Chiang. Reply Brief at 16 n. 8.

Muller testified that he was contacted by Norio Kasai, Kurosawa's United States representative, on approximately March 1, 1989, or about two weeks after Muller had last met with Kurosawa. Kasai told Muller that Kurosawa would like to meet with him in about two weeks during his next regular visit to the United States. Muller at 100–101. Muller also testified that Tsuchiya, the lawyer he hired while in Japan, contacted him during March to tell him he was interested in making a personal investment in IBC. Tsuchiya also told Muller that "[h]e [Tsuchiya] was in touch with Mr. Kurosawa, and Mr. Kurosawa liked International Banknote." *Id.* at 103. Tsuchiya

purchased a large block of IBC stock on March 10, 1989.

On March 3 or 4, 1989, Muller called Bohrer in Florida and asked him to come to New York for a meeting to be held on March 6, 1989 regarding IBC. Bohrer at 36. Muller told Bohrer that there were several people who "felt similarly" about IBC and asked him to come to the meeting to discuss his "common woes." *Id.* Bohrer flew to New York specifically for the March 6 meeting and immediately thereafter returned to Florida. *Id.* at 37. The meeting was held at the offices of Mandel, Resnik & Mortman, the law firm that later became counsel to the Committee. *Id.* at 36.

Bohrer testified that the meeting was initially attended by Muller, Smith, Chiang, Hesse, and Scott Schwartz (Bohrer's son-in-law). At the hour and a half meeting, they discussed, among other things, changing IBC's management, "get[ting] together [to influence management]", and a proxy contest. *Id.* at 39, 42–43. Bohrer also testified that "we retained counsel on the 6th. Then we went ahead formally on the 15th or 16th." *Id.* at 55–56. Smith testified that no agreements were made at this meeting. Smith at 244–245.

On March 9, 1989, the combined holdings of the individual defendants reached 5 percent. Muller Aff. at ¶ 5. On Friday March 10, 1989, IBC released its fourth quarter report, showing earnings $1 million lower than IBC had projected. Bohrer at 50; Smith at 93.

On Monday, March 13, 1989, Muller met with Kurosawa, Kasai, Chiang, and counsel David Mortman at the law offices of Mandel, Resnik & Mortman. Muller at 104. Muller testified that Kurosawa was aggrieved over the poor performance of the Company in the fourth quarter and asked Muller and Mortman "what should be done to remove management." *Id.* at 120. Muller testified that in response to Kurosawa's concern, "[w]e made some calls and told people of Mr. Kurosawa's feelings. Some of the people said, yes, we agree with that and we would like to join Mr. Kurosawa." *Id.* Muller met with Kurosawa again on

March 14, and he and counsel arranged for a meeting of dissatisfied shareholders on March 15, 1989. *Id.* at 121–123.

Committee coordinator Smith testified that after the fourth quarter earnings were released on March 10, 1989, "it was kind of like somebody set off a firecracker." Smith at 226. Smith stated that the defendants in attendance at the March 15, 1989 meeting decided to form a shareholders' committee to act together to change IBC's management. *Id.* at 207. Smith was asked and agreed to act as the coordinator of the Shareholders' Committee. *Id.* at 213–214. He testified that his appointment as coordinator came about as "the consensus of opinion amongst the various people that were involved." *Id.*

Muller testified that there was no discussion at the March 15, 1989 meeting of any role Muller would play in replacing the management of IBC. Muller at 130. At the March 15, 1989 meeting, the Committee hired Dorian Industries, a company owned entirely by Muller's two daughters and of which Muller is a consultant, to act as a consultant to the Committee for a flat fee of $50,000 plus expenses. *Id.* at 131–141.

## III. *Discussion*

### 1. *Plaintiff's Motion for a Preliminary Injunction*

It is well established in this Circuit that to obtain a preliminary injunction, plaintiff must establish irreparable harm and either (1) a likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and balance of hardships tipping decidedly in its favor. *See Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.,* 596 F.2d 70, 72 (2d Cir.1979) (*per curiam*).

### a) *Irreparable Harm*

Plaintiff contends that unless the Committee is enjoined from waging a proxy contest for control of IBC's Board of Directors, the shareholders will be compelled to make hasty and ill-informed decisions regarding the voting of Company stock on the basis of false and misleading informa-

tion. Complaint 1 at ¶ 52(a). Plaintiff further alleges that defendants' conduct has irreparably tainted the proxy process to the point where a fair proxy contest can no longer be held. Plaintiff's Reply at 56. Because the Court finds that plaintiff has not established irreparable harm, plaintiff's motion is denied.

#### b) Section 13(d)

█ Section 13(d) of the Act, 15 U.S.C. § 78m(d), requires that any person or group which directly or indirectly becomes the beneficial owner of more than 5 percent of any registered security must file a Schedule 13D with the Securities and Exchange Commission ("SEC") within 10 days. 17 C.F.R. § 240.13d–1. A "beneficial owner" includes any person with 1) voting power, or 2) investment power over the securities. *Id.* § 240.13d–(a)(1), (2). A group for purposes of section 13(d) need not be formally organized nor need it memorialize its intentions in writing; all that is required is that its members combine in furtherance of a common objective. *Wellman v. Dickinson*, 682 F.2d 355, 362–63 (2d Cir.1982), *cert. denied sub nom., Dickinson v. S.E.C.*, 460 U.S. 1069, 103 S.Ct. 1522, 75 L.Ed.2d 946 (1983).

█ A "group" owning less than 5 percent of the stock, no matter what its intentions, need not file a Schedule 13D. Thus, as a matter of law, defendants could not have been required to file a Schedule 13D until 10 business days from March 9, 1989, the first day that their combined holdings reached 5 percent of the common stock.

█ Defendants contend that a group was not formed for purposes of Section 13(d) until March 15, 1989, five days after IBC released its quarterly earnings. Smith testified that "after the [March 10] earnings [report for the fourth quarter] came out, it was kind of like somebody set off a firecracker." Smith at 266. The Court has difficulty crediting this testimony given the strong circumstantial evidence indicating that defendants intended at a much earlier date to seek control of the Company. The Smith Report, prepared in early February, specifically states that

[i]t will be necessary for the shareholders to force a change in the direction of the company. This may be accomplished most rapidly by obtaining an equity position with adequate votes to replace all or at least a substantial portion of the company's board of directors at the company's annual meeting.

Smith Report at 10. Defendants admit this report was shown prior to March 9, 1989 to at least five of the defendants (Chiang, Kurosawa, Tsuchiya, Tung, and Wang). The Committee argues that each defendant made an independent investment decision to acquire the stock, but Committee members in almost every instance purchased stock shortly after meeting with Muller. Four defendants met at their counsel's office on March 6, 1989, four days before the "firecracker" fourth quarter loss was posted. Smith at 176–177; Bohrer at 36, 55–56. Bohrer further testified that a proxy contest was discussed at the March 6, 1989 meeting and that counsel was retained on that day. Bohrer at 51. Moreover, the Court draws an inference that defendants were acting in concert at least by early March from the fact that large block purchases in identical quantities were made by KCL, Double Helix, and Panacrown from Smartwood Hesse, Inc., a small brokerage firm located in New York City in the same offices as Muller, Smith, and Chiang.

Based on the record currently before it, the Court therefore finds that plaintiff is likely to be able to show at trial that defendants combined in furtherance of a common objective at least as of March 6, 1989 and thus failed to comply with section 13(d) of the 1934 Act by not filing a Schedule 13D 10 days after their combined holdings equalled 5 percent.

Despite having demonstrated that defendants likely violated of section 13(d), plaintiff has not shown that it is entitled to the extreme remedy it seeks. In *Rondeau v. Mosinee Paper Corp.*, 422 U.S. 49, 95 S.Ct. 2069, 45 L.Ed.2d 12 (1975), the Supreme Court held that a showing of irreparable harm is necessary for a private litigant to obtain injunctive relief in a suit under section 13(d). The Supreme Court noted that

the purpose of section 13(d) and other disclosure requirements is to ensure that public shareholders who are confronted by a tender offer will not be required to respond without adequate information regarding the qualifications and the intentions of the offering party. *Id.* at 58, 95 S.Ct. at 2076. In this case, IBC shareholders will not have been forced to make an immediate decision based on incomplete information. Even accepting, *arguendo*, that at least some of the defendants have been acting collectively since mid-February, the Committee filed its Schedule 13D only seven days late,[7] and still almost two months before the May 25, 1989 annual meeting.

In *Universal Container Corp. v. Horwitz*, [1977–78 Transfer Binder] Fed.Sec.L. Rep. (CCH) ¶ 96,161 at 92,242, 1977 WL 1036 (S.D.N.Y.1977), the court denied injunctive relief despite the fact that defendants had filed their Schedule 13D several months late. The court stated:

> the chief lesson to be drawn from *Rondeau* ... is that a private suitor in a case such as this must, if he seeks and is to receive equitable relief, do more than establish a technical violation of the statute. That is, in the absence of a showing of 'irreparable harm and other usual prerequisites for injunctive relief,' 422 U.S. at 65, *Rondeau* instructs us that a late filing of a Schedule 13D is alone not enough to support the grant of an injunction, whatever the form.

*Id.* at 92,255.

Similarly, in *Pantry Pride, Inc. v. Rooney*, 598 F.Supp. 891 (S.D.N.Y.1984), the court concluded that even if a "group" for purposes of section 13(d) existed two weeks earlier than disclosed, it would not justify the issuance of a preliminary injunction. The court stated:

> [t]he only prejudice that it could cause plaintiff would be that plaintiff remained ignorant of the proxy challenge for two weeks.... In such a situation, the

Court would consider an application to adjourn the election so that management would have sufficient opportunity to investigate the Committee and make the results of the investigation known to the stockholders. However, plaintiff does not move for any adjournment of the election.

*Id.* at 900. *See also Standard Metals Corp. v. Tomlin*, 503 F.Supp. 586, 600–604 (S.D.N.Y.1980) (injunctive relief available under Section 13(d) only to the extent of ensuring that shareholders and investors have accurate information). Here, the prejudice to plaintiff is slight considering that defendants filed their original Schedule 13D only one week late. Moreover, as in *Pantry Pride*, plaintiff has not sought to adjourn the May 25, 1989 election.[8]

Plaintiff has also not shown that it lacks the information necessary to evaluate defendants' slate of directors. As a result of the expedited discovery the Court granted in these actions, plaintiff has amassed volumes of information concerning the defendants which it will undoubtedly disclose to stockholders (within the limits of the proxy rules) during the ensuing proxy contest. Thus, the Court finds that defendants' probable late filing of its Schedule 13D does not constitute irreparable harm to plaintiff.

Plaintiff also alleges that IBC shareholders have been irreparably harmed by defendants' false and misleading disclosures. Plaintiff claims that defendants' original Schedule 13D contains numerous false and deceptive statements, many of which have yet to be corrected despite the multitude of amendments defendants have filed and continue to file with the SEC.

Defendants' most serious possible misstatement of fact is their claim in Item 4 of their Schedule 13D that "prior to March 15, 1989, [shares] were acquired for investment." Schedule 13D, Harper Aff. at Ex.

---

7. Defendants filed their original Schedule 13D on Monday, *March 27, 1989,* ten days from March 15, 1989 (the tenth day fell on the weekend). Defendants reached the 5 percent threshold on March 9, 1989. Ten days from March 9, 1989 is *March 20, 1989.*

8. Plaintiff's counsel requested that the Court not even consider adjourning the annual meeting. Telephonic conference of April 27, 1989.

D. As previously discussed, the Court is convinced that plaintiff could likely show at trial that prior to March 15, 1989, defendants purchased IBC shares in anticipation of waging a proxy fight. Thus, at minimum, defendants should have stated that the purchase of at least some of their IBC shares prior to March 15, 1989 was motivated by purposes other than investment. The Court finds, however, that this possibly false disclosure would have little or no impact on shareholders or investors reading the Schedule 13D at the time of its release because the paragraph following the statement referred to above clearly states that the group's present intention is to seek a change in the composition of the Board. In the first sentence of the next paragraph (still under Item 4) the Committee states:

> [i]n furtherance of that purpose [maximizing the value of the Company's stock], the members of the Shareholders' Committee intend to seek a change in the composition of the Board of Directors of the Company at the Company's annual meeting of the shareholders, which the Shareholders' Committee believes is scheduled for May 25, 1989, by proposing a slate of directors in opposition to management's slate and by taking such other steps as the Shareholders' Committee considers appropriate.

*Id.* at 6–7. No reasonable shareholder or investor could have any doubt about the intentions of the Committee after reading this statement. IBC was thus placed on notice at the time of the filing of the Original Schedule 13D (March 27, 1989) that the Committee intended to seek a change in corporate control. To the extent that the statement concerning the Committee's prior intent is inaccurate (and material), legal remedies are adequate to rectify any harm that might have occurred, *see Standard Metals Corp.*, 503 F.Supp at 602, and proper relief on these facts would be a curative disclosure, not a preliminary injunction. *Rondeau,* 422 U.S. at 57–65, 95 S.Ct. at 2075–2079; *Treadway Companies, Inc. v. Care Corp.,* 638 F.2d 357, 380 (2d Cir.1980) (subsequent filing of a Schedule 13D dis-closing unequivocal intention to seek control cured any deficiency in earlier filings).

Plaintiff further contends that defendants' original Schedule 13D was misleading for failure to state in Item 2 that Muller was the subject of two related SEC enforcement actions (defendants listed one case and claimed the other was a "companion action"), for falsely describing in Item 3 the source of defendant Kurosawa's funds (his funds were listed as corporate rather than personal), and for claiming in Item 6 that Muller was a "Consultant" (rather than the prime motivator behind defendants' plan). The Court finds that these minor misstatements have not caused the type of harm that only equity could redress or prevent, *see Universal Container Corp,* [1977–78 Transfer Binder] Fed.Sec.L.Rep. (CCH) at 92,257, and have been cured through subsequent disclosures.

Plaintiff also contends that irreparable harm will result from the Committee's continued failure to disclose the statutorily required information. *See General Aircraft Corp. v. Lampert,* 556 F.2d 90, 96–97 (1st Cir.1977). The Court does not find that defendants have failed to disclose their plans or objectives for IBC's future or any evidence that defendants are harboring undisclosed information. *See Standard Metals Corp. v. Tomlin,* 503 F.Supp. 586, 602 (S.D.N.Y.1980). Plaintiff also claims that defendants' "blizzard of [corrective] amendments" have only confused shareholders. Plaintiff's Reply at 46. The Court first notes that defendants' amendments have not significantly altered their original Schedule 13D—the Committee's membership and proclaimed intentions have remained largely unchanged. Furthermore, given that the purpose behind the Williams Act is full disclosure, the Court is reluctant to condemn defendants for making the required amendments.

Therefore, plaintiff has not shown that defendants' possible violations of Section 13(d) justify the broad based injunctive relief sought.

### c) Section 14(a)

■ Plaintiff also argues that defendants' alleged violations of section 14(a) of

the 1934 Securities Act constitute irreparable harm. Section 14(a) of the Exchange Act and SEC Rules 14a–3, 14a–6 and 14a–11, bar the solicitation of proxies by any person other than the issuer until at least five days after the filing of a Schedule 14B. In order to establish a violation of the SEC Proxy Solicitation Rules, it must be demonstrated that (1) more than 10 persons were solicited; and (2) the solicitations were part of a continuous plan ending in, and in aid of, a proxy solicitation. *Chris–Craft Inds. v. Independent Stockholders Comm.*, 354 F.Supp. 895, 906 (D.Del.1973).

■ Plaintiff first contends that the Committee members belatedly filed their Schedules 14B because more than 10 people were solicited by Muller and others acting in concert with him before the March 28, 1989 filing of their original Schedules 14B.[9] By plaintiff's own count, however, plaintiff only has "hard evidence of ... 10 people who were solicited," Hearing at 76, and suggests just two other possible solicitees by name. *Id.* Plaintiff has thus, by its own admission, failed to meet its burden of showing that more than 10 people were solicited; the extreme remedy of injunctive relief is not appropriate.

Moreover, there has also been no showing that anyone has been misled by defendants' activities. As stated by Judge Conner in *Pantry Pride,*

> The purpose of court-sanctioned enforcement of nonsolicitation provisions is not to frustrate shareholders who wish to exercise their franchise in favor of a proposed change in management, but

rather, to ensure that adequate information is disclosed.

598 F.Supp. at 902. Plaintiff has thus failed to show a likelihood of success on the merits of its claim that defendants untimely filed their Schedules 14B, and more importantly, has not demonstrated that the *de minimis* violation that they allege is commensurate with the drastic relief sought.

Plaintiff next alleges that defendants have filed false and misleading Schedules 14B. As discussed in connection with the alleged false and misleading statements contained in defendants' Schedule 13D, the Court finds that any possible misstatements have been cured by the amended filings, the voluminous discovery, and the ample time for plaintiff to communicate its message to its shareholders.

In conclusion, because plaintiff has not demonstrated that defendants' possibly material omissions and misstatements cannot be cured by full disclosure or that defendant is engaged in a continued practice of non-disclosure, the Court finds that plaintiff has not shown that it will suffer irreparable harm unless the broad relief it seeks is granted. Thus, plaintiff's motion for a preliminary injunction is denied.

### 2. *Defendants' Motion for a Preliminary Injunction*

■ Defendants seek to enjoin enforcement of a recently enacted IBC by-law ("the By-law"), which requires, *inter alia,* that slates of proposed directors be filed with IBC's Board of Directors no later than 45 days prior to an annual meeting.[10] The

---

**9.** Because Schedules 14B were first filed for members of the Committee on March 28, 1989, any "solicitations" made prior to April 4, 1989 (five days after the filing) would be in violation of Rule 14–11(a).

**10.** The full text of Section 9 of IBC's by-law reads:

> SECTION 9. *Nominations.* Subject to the rights of holders of any class or series of stock having a preference over the Common Stock as to dividends or upon liquidation, nominations for the election of Directors shall be made by the Board of Directors or a proxy committee appointed by the Board of Directors or by any stockholder entitled to vote in the election of Directors generally. How-

> ever, any stockholder entitled to vote in the election of Directors generally may nominate one or more persons for election as Directors at a meeting only if written notice of such stockholder's intent to make such nomination or nominations has been given, either by personal delivery or by United States mail, postage prepaid, to the Secretary of the corporation not later than (i) with respect to an election to be held at an annual meeting of stockholders, *45 days in advance of such meeting,* and (ii) with respect to an election to be held as a special meeting of stockholders for the election of Directors, the close of business on the seventh day following the date on which notice of such meeting is first given to stockholders. *Each such notice from the*

Board enacted the 45 day by-law on March 28, 1989, the day after the Commission filed its Schedule 13D, and 58 days before the previously scheduled May 25, 1989 annual meeting. IBC claims that the By-law is a valid method of giving the Board and the shareholders time to review the qualifications of insurgent nominees in advance of an annual meeting. IBC also denies that defendants could have suffered irreparable harm from the enforcement of the By-law because defendants would have had 13 days to comply with the By-law had they not obtained a TRO enjoining its enforcement.[11] The Committee, on the other hand, claims that the Board's enactment of this By-law is a transparent attempt to entrench management by either blocking the Committee from nominating and electing their slate altogether or at minimum, giving the Board an inequitable advantage in the proxy contest. The Committee also argues that compliance with the By-law would force defendants to violate the federal securities laws.

### a) Irreparable Harm

Courts have consistently found that corporate management subjects shareholders to irreparable harm by denying them the right to vote their shares or unnecessarily frustrating them in their attempt to obtain representation on the board of directors. *See Danaher Corporation v. Chicago Pneumatic Tool Co.*, No. 86 Civ. 3499 (PNL) slip op., 1986 WL 7001 (S.D.N.Y. June 16, 1986); *Treco, Inc. v. Land of Lincoln Sav. and Loan*, 572 F.Supp. 1447, 1450 (N.D.IL 1983); *Minstar Acquiring*

*Corp. v. AMF Inc.*, 621 F.Supp. 1252 (S.D. N.Y.1985) (plaintiff will suffer irreparable harm if its tender offer is defeated due to illegal defensive tactics); *Bank of New York Company, Inc. v. Irving Bank Corporation*, 139 Misc.2d 665, 528 N.Y.S.2d 482, 484 (Sup.Ct.1988) (irreparable harm if corporate electoral process is tainted).

### b) Success on the Merits

Defendants first argue that the By-law is invalid under New York common law because it was enacted for the sole purpose of entrenching management. In *Schnell v. Chris Craft Industries, Inc.*, 285 A.2d 437 (Del.1971), an incumbent board of directors amended the Company's by-laws in order to advance forward the date of the annual meeting and as a result, reduced the amount of time an insurgent group had to wage a proxy battle. The Delaware Supreme Court found the Board had obstructed the legitimate interests of dissident shareholders and acted in furtherance of an inequitable purpose. *Schnell* thus struck down the board's decision and moved the meeting to its originally scheduled date. *Id.* at 439.

In *Lerman v. Diagnostic Data, Inc.*, 421 A.2d 906 (Del.Ch.1980), the court invalidated an amended by-law which the board of directors enacted after learning of an impending proxy fight. The board amended the by-laws to require that any parties seeking to serve on the board notify the corporation at least 70 days in advance of their intention to seek election. The board then proceeded to call a meeting on 63 days

---

*stockholder to the Secretary shall set forth: (a) the name and address of the stockholder who intends to make the nomination and of the person or persons to be nominated; (b) a representation that the stockholder is a holder of record of stock of the corporation entitled to vote at such meeting and intends to appear in person or by proxy at the meeting to nominate the person or persons specified in the notice; (c) a description of all arrangements or understandings between the stockholder and each nominee and any other person or persons (naming such person or persons) pursuant to which the nomination or nominations are to be made by the stockholder; (d) such other information regarding each nominee proposed by such stockholder as would be required to be*

*included in a proxy statement filed pursuant to the proxy rules of the Securities and Exchange Commission, had the nominee been nominated, or intended to be nominated, by the Board of Directors; and (e) the consent o each nominee to serve as a Director of the corporation if so elected. The chairman of the meeting may refuse to acknowledge the nomination of any person not made in compliance with the foregoing procedure.*

*See* Harper Affidavit, Ex. A (emphasis added).

**11.** This Court entered a Temporary Restraining Order enjoining the enforcement of the by-law on April 7, 1989. The TRO was extended by order of the Court on April 19, 1989.

notice. The court, without reaching the validity of the advance notice by-law itself, found that under the circumstances the by-law operated inequitably to preclude plaintiff from contesting incumbent management. *Id.* at 914.

Plaintiff argues that notwithstanding the narrow exception in the above cases, the business judgment rule protects the Board's decision to enact the By-law from judicial scrutiny. *See Auerbach v. Bennett,* 47 N.Y.2d 619, 419 N.Y.S.2d 920, 926–927, 393 N.E.2d 994, 1000–1001 (1979) ("by definition, the responsibility for business judgments must rest with the corporate directors; their individual capabilities and experiences particularly qualify them for the discharge of that responsibility"). Plaintiff seeks to distinguish *Schnell* and *Lerman* from the instant case by arguing that courts have applied their rationale only to those acts which have no purpose other than to entrench directors. Counsel for plaintiff stated at oral argument that even assuming, *arguendo,* that the By-law was passed, in part, for purposes of entrenchment,

> [the] cases are clear, that the by-law must be sustained even on this hypothesis where one purpose is bad provided it was not the sole or the predominant purpose and that the—there were other valid corporate reasons for the action.

Hearing at 43. Plaintiff goes so far as to claim that the Board could have properly precluded nominations at 1989 annual meeting altogether by adopting a 60 day advance notice by-law (58 days before the meeting), but they chose not to. Memorandum of Law In Opposition to [the Committee's] Motion for a Preliminary Injunction at 19–20.

In support of its argument that the business judgment rule protects this action from scrutiny, plaintiff cites *American International Rent A Car, Inc. v. Cross,* 9 Del.J.Corp.L. 144, 1984 WL 8204 (Del.Ch. 1984), which upheld a board's action amending the corporation's by-laws even though the corporation's shareholders were about to reject those same amendments at a shareholders' meeting. The court found

that plaintiff had failed to rebut the presumption of the business judgment rule that the Board acted to amend the bylaw in the good faith belief that such action was in the best interests of the company. *Id.* at 148. *Cross* noted, however, that unlike in this case, the disgruntled shareholders had several options available to them, including voting the incumbent shareholders out of office. The court also did not find that the board acted even partially for entrenchment purposes.

Plaintiff also cites *Huffington v. Enstar Corp.,* 9 Del.J.Corp.L. 185 (Del.Ch.1984), where the court refused to enjoin a board of directors from *postponing* a shareholders' meeting at which the directors were up for reelection. *Huffington,* however, found that *Schnell* and *Lerman* were not applicable because

> [t]he Plaintiffs are not being forced to prepare their proxy contest so hastily that they are denied sufficient time to effectively prepare for the contest. Furthermore, they are not being denied the opportunity to vote or to participate in the annual meeting. *They are given more time to prepare for it.* The patent conclusion, therefore, is that this is not a *Schnell* or *Lerman* situation.

*Huffington,* 9 Del.J.Corp.L. at 190 (emphasis added). *Huffington* thus does not assist plaintiff here because IBC significantly shortened the amount of time defendants had to prepare for the annual meeting.

Finally, IBC cites one case that upheld the validity of a similar by-law amendment. *Nomad Acquisition Corp. v. Damon Corp.,* C.A. no. 10173, slip op., 1988 WL 96192 (Del.Ch. September 16, 1988) rejected a preliminary challenge to an advance notice by-law that had been enacted in reaction to a hostile take-over bid. The facts in *Nomad,* however, differ significantly from the instant case. First, *Nomad* does not suggest that the provision was aimed at a specific annual meeting or even that plaintiff had indicated an intention to submit an alternative slate of directors at the next annual meeting. In fact, the *Nomad* court notes that plaintiff failed even "to articulate" how it would suffer irreparable

harm from the operation of the by-law. *Id.* at 23. Moreover, the court specifically found that the company's defensive measures, including the by-law, were enacted for the benefit of the shareholders and not for the purpose of entrenching management. *Id.* at 14–15. In *Nomad,* the Court found that the board had an affirmative duty to oppose the inadequate offer then before it.

The Court concludes that under the circumstances presented here, the directors cannot seek refuge in the business judgment doctrine. The record now before the Court suggests that the corporate board members breached their fiduciary duty of care by adopting without careful consideration a provision which drastically shortened the amount of time defendants had to prepare for the proxy contest. As stated by the Second Circuit:

> the exercise of fiduciary duties by a corporation board member includes more than avoiding fraud, bad faith and self-dealing. Directors must exercise their 'honest judgment in the lawful and legitimate furtherance of corporate purposes,' *Auerbach,* 419 N.Y.S.2d at 926 [, 393 N.E.2d at 1000]. It is not enough that directors merely be disinterested and thus not disposed to self-dealing or other indicia of a breach of the duty of loyalty. Directors are also held to a standard of due care. They must meet this standard with a 'conscientious fairness,' [citation omitted]. For example, where their 'methodologies and procedures' are so restricted in scope, so shallow in execution, or otherwise so pro forma or halfhearted as to constitute a pretext or sham, *then inquiry into their acts is not shielded by the business judgment rule.*

*Hanson Trust PLC v. ML SCM Acquisition, Inc.,* 781 F.2d 264, 274 (2d Cir.1986) (emphasis added).

Here, the IBC directors enacted the By-law less than 24 hours after receiving the Committee's Schedule 13D, Handler Aff. at Ex. S, and only 58 days before the previously scheduled annual meeting. Eugene Jonas, the Executive Vice President of IBC and a member of the Board, testified that it was his idea to adopt the By-law, *Id.* at 115, but he also stated that before he received the Schedule 13D the day before the board meeting, he had never even considered amending the by-laws with an advance notice provision. *Id.* at 113. Furthermore, Jonas testified that the purpose of the By-law was to disseminate nominee information to the shareholders, but he acknowledged that the By-law did not even require the Board to distribute the information supplied by the Committee. *Id.* at 123.

Neither Edward H. Weitzen, the President of IBC, Jonas, nor four of the directors who attended the March 28, 1989 Board meeting could recollect any specific discussion or questions about the By-law following the presentation by Jonas. Weitzen at 122–123, Jonas at 200–201, Keith at 52–53, Rosenthal at 11–13, Glass at 59–60, Askanase at 61–63. In fact, the directors testified that the actual language of the By-law language had not even been prepared when the vote was taken. Weitzen at 122, Askanase at 66–68, Keith at 55, Rosenthal at 11, Glass at 60.

The Board thus breached its duty of care owed to all shareholders—a duty not excused even by the perceived need to take fast action when threatened by a hostile takeover. *Norlin Corp. v. Rooney, Pace Inc.,* 744 F.2d 255, 266 (2d Cir.1984). The IBC directors' inquiry into the Committee and the ramifications of the By-law appears to have been devoid of diligence and deliberation. *See Hanson Trust PLC,* 781 F.2d at 274. The Court thus finds that defendants have shown that there is a substantial likelihood that the IBC Board breached its fiduciary duty of care to the shareholders and that as a result, the business judgment rule does not apply.

The Court also finds that there is a substantial likelihood that the Committee will succeed at trial in showing that the Board's primary motivation for adopting the By-law was entrenchment. Under New York law, once a plaintiff has met its initial burden of showing that the directors breached their fiduciary duty of care, the burden of justifying a defensive takeover tactic shifts to

the directors. *Hanson Trust PLC,* 781 F.2d at 277. The directors can meet this burden by showing that they had reasonable grounds for believing that there was a danger to corporate policy and effectiveness. *Unocal Corp. v. Mesa Petroleum Co.,* 493 A.2d 946, 948, 955 (Del.Supr.1985). This burden is satisfied by a showing of good faith and reasonable investigation. *Id.* at 955. The board must also show that the responsive action was reasonable in relation to the threat posed. *Id.*

In this case, IBC has not overcome the Committee's *prima facie* showing that the Board's adoption of the By-law was done primarily to entrench management. *See Minstar Acquiring Corp. v. AMF, Inc.,* 621 F.Supp. 1252, 1261 (S.D.N.Y.1985) (the creation of trust funds which would become irrevocable upon a change of control of the corporation raised a strong inference that the trust funds were designed solely for the benefit of incumbent management); *Norlin Corp.,* 744 F.2d at 265 (creation of ESOP during battle for corporate control created strong inference that purpose of transaction was to solidify management's position); *Schnell,* 285 A.2d at 439 ("[w]hen the by-laws of a corporation designate the date of the annual meeting of stockholders, it is to be expected that those who intend to contest the reelection of incumbent management will gear their campaign to the by-law date. It is not to be expected that management will attempt to advance that date in order to obtain an inequitable advantage in the contest."); *Lerman,* 421 A.2d at 914 (same).

Moreover, plaintiff has not met its burden of justifying a defensive takeover tactic by a showing of good faith and reasonable investigation. *See Unocal Corp.,* 493 A.2d at 955. IBC adopted the 45 day By-law within 24 hours of being placed on notice that the Committee intended to wage a proxy contest, 58 days before the annual meeting was scheduled and long after the date for the annual meeting had been set. Jonas, who proposed the amendment, testified that he had never before considered the need for such a By-law before the

insurgents filed their 13D; yet there was almost no discussion about the By-law when the directors voted. Furthermore, the directors did not even have a copy of the text of the By-law before them when they voted. Finally, Jonas' deposition testimony reveals a desire to maintain management's control rather than to act in the best interests of the shareholders. Jonas stated at his deposition that after receiving the 13D, management sent it immediately to counsel telling them "to take all steps that may be necessary." Jonas at 117. When asked, "Were you authorized under the by-law to take any action with respect to an opposing slate that was presented to you for evaluation?", Jonas responded, "I believe that I answered that previously when I said that we would take all steps to protect our position." *Id.* at 119–120.

The Court rejects plaintiff's contention made during oral argument that the Court must uphold IBC's by-law if it was enacted for mixed purposes. According to plaintiff's counsel,

> [i]n short, this hypothesis leads to a by-law offered for mixed motives. Again, cases are clear, that the bylaw must be sustained even on this hypothesis where one purpose is bad provided it was not the sole or the predominant [12] purpose and that the—there were other valid corporate reasons for the action.

Hearing at 43 (citing the Seventh Circuit decisions in *Panter v. Marshall Field & Co.,* 646 F.2d 271, 297 (7th Cir.1981) (citing *Cheff v. Mathes,* Del.Supr., 199 A.2d 548 (1964)), and *Treco v. Land of Lincoln Savings and Loan,* 749 F.2d 374, 377 (7th Cir.1984) (citing *Panter*) and the Delaware Supreme Court's decision in *Unocal Corp. v. Mesa Petroleum,* 493 A.2d 946 (1985) (citing *Cheff*)). Hearing at 43.

The Court first notes that *Panter, Treco,* and *Unocal* do not protect all defensive tactics employed for mixed purposes. That the directors of IBC may have been motivated, in part, by "good" motives does not save the By-law if their "primary" reason was to protect their jobs. Secondly, plain-

---

12. The Court notes that the cases cited by plaintiff use the words "primary purpose."

tiff's reliance on *Unocal* is misplaced. *Unocal* states:

> [t]he restriction placed upon a selective stock repurchase is that the directors may not have acted solely or primarily out of a desire to perpetuate themselves in office. *See Cheff. . . . Of course, to this is added the further caveat that inequitable action may not be taken under the guise of law.* [citing *Schnell*] . . . The standard of proof established in *Cheff v. Mathes* . . . is designed to ensure that a defensive measure to thwart or impede a takeover is indeed motivated by a good faith concern for the welfare of the corporation and its stockholders, *which in all circumstances must be free of any fraud or other misconduct. Cheff v. Mathes,* 199 A.2d at 554–55.

493 A.2d at 955 (emphasis added).

*Unocal* also does not support plaintiff's position because the Board members here did not conduct a "reasonable investigation" before implementing a defensive measure. *See* 493 A.2d at 955.

The Court thus finds that there is a substantial likelihood that IBC enacted the By-law primarily to frustrate the vote of dissident shareholders, and that a temporary injunction against its enforcement is appropriate. *See Schnell,* 285 A.2d at 437; *Lerman,* 421 A.2d at 906.

### c) Balance of Hardships

There is also a second ground for enjoining the enforcement of the By-law. Defendants have made a strong showing that compliance with the By-law would have violated at least the spirit of federal securities regulations. The By-law requires the submission to the Board of, *inter alia,* (d) such other information regarding each nominee proposed by such stockholder as would be required to be included in a proxy statement filed pursuant to the proxy rules of the Securities and Exchange Commission.

Harper Aff. at Ex. A. The Court finds this portion of the By-law ambiguous. It is unclear whether, to comply, the Committee was required to submit to the Board the information included in (1) the preliminary proxy materials filed with the SEC [13], or (2) the proxy materials as finally approved by the SEC.

Here, the Committee could not have given the Board the latter (the information included in the finally-SEC-approved proxy statement) 45 days before the annual meeting. The By-law was adopted 58 days before the annual meeting. This would have allowed the Committee only 13 days to prepare their proxy materials and submit them for, at minimum, a 10 day SEC review process.[14] Even if the SEC approved the Committee's materials as submitted, the Board did not contend that 3 days was sufficient time for the Committee to prepare their proxies. *See* Jonas at 114 ("I felt [45 days] would give everyone 13 days for you to prepare your slate and that should be sufficient time since we already had our slate").

If the By-law requires instead the former (the information included in the draft proxy statement filed with the SEC), the By-law would violate the spirit of the SEC regulation that denies public access to preliminary materials filed with the SEC.[15]

---

**13.** Rule 14a–6 promulgated under Regulation 14A of the 1934 Act (17 C.F.R. § 240.14a–9) of the proxy solicitation regulations requires that all preliminary proxy materials be filed with the SEC at least 10 days prior to their dissemination to shareholders. The purpose of this regulation is to permit the SEC to review and approve the materials prior to their dissemination to shareholders.

**14.** The review process frequently takes longer than 10 days because the SEC recommends changes which must then be resubmitted and reviewed.

**15.** 17 C.F.R. ¶ 240.14a–6(f) provides:

> (f) *Public Availability of Information*
> All copies of preliminary materials filed pursuant to this Regulation shall be clearly marked "Preliminary Copies," shall be for the information of the Commission only and shall not be deemed available for public inspection until definitive material has been filed with the Commission except that such material may be disclosed to any department or agency of the United States government and to the congress, and the Commission may take such inquiries or investigation regard to the material as may be necessary for an adequate review thereof by the Commission.

Defendants interpret the language of the By-law as requiring that they submit to the Company information that would otherwise remain confidential until approved by the SEC as well as information that might never be released or that might be released in modified form because of changes recommended by the SEC. Defendants thus contend that submitting this information to IBC in advance gives the IBC an unfair "head start" in waging the proxy contest. They also contend by allowing the Company access to their proxy materials before and after they were approved by the SEC, the Company would be in a position to make use of materials that were altered or disapproved by the SEC. Plaintiff appears to concede that such use of defendants' preliminary proxy materials might be improper. Plaintiff's counsel suggested during oral argument that if defendants were concerned that IBC could unfairly monitor the confidential relationship between the Committee and the SEC,

> the alternative would be for the insurgents to apply to this Court for a ruling that would prohibit the board from relying upon the difference, if any, between the initial submission under the bylaw and the final proxy as issued after SEC review.

Hearing at 45.

Neither party has submitted authority to the Court that specifically discusses defendants' contention that compliance with the By-law would constitute a violation of the securities laws. While *Nomad* preliminarily refused to strike language similar to that at issue here, this apparently novel argument was not raised in that decision.

The Court finds the By-law language ambiguous and possibly subject to the interpretation that defendants suggest. The Court is also concerned about the possible misuse by IBC of preliminary proxy material procured prior to SEC approval and does not believe, as an equitable matter, that the Committee was obligated, as IBC suggests, to seek prophylactic relief against misuse of the By-law rather than moving to enjoin its enforcement. The Court thus finds that the Committee has demonstrated suffi-

ciently fair questions going to the merits to make them a fair ground for litigation. Moreover, because the By-law has the possible effect of either precluding the Committee from submitting their slate to the shareholders altogether or forcing them to prepare their materials within an inadequate amount of time, the Court finds a balance of hardships tipping decidedly toward the defendants. Therefore, a preliminary injunction is appropriate to prevent the enforcement of this By-law.

### 3. *Defendants' Motion to Enjoin Plaintiff from Violating the Proxy Solicitation Rules*

■ Defendants also seek a preliminary injunction enjoining plaintiff from violating the proxy rules. Defendants maintain that IBC violated section 14(a) of the 1934 Act and Rule 14a–9 by distributing a press release concerning defendant Muller following the filing of this suit. Defendants have not shown either that the Company's press release was false or misleading or that irreparable harm will result if this injunction is not entered. The motion is therefore denied.

### CONCLUSION

For the reasons stated above, plaintiff's motion for a preliminary injunction and for declaratory relief is denied; defendants' motion to enjoin enforcement of IBC's advance notice By-law is granted. Defendants' motion to enjoin plaintiff from disseminating false and misleading proxy materials is denied.

SO ORDERED.